OBADIAH SANDS

*v.*

CHARLES H. POTTER.

*Filed at Ottawa November 9, 1896—Rehearing denied March 9, 1897.*

1. CONTRACTS—*degree of mental incapacity required to impeach a contract.* To impeach a contract for mental incapacity the mental weakness must have been such that the party was incapable of understanding what he was doing, or comprehending the terms, scope and effect of his contract.

2. SAME—*there is no fixed form for stating requisite degree of mental capacity.* An instruction that a contract cannot be impeached if the parties "possess mind, memory and senses sufficient to know and comprehend the scope, force and effect of their contract," is not antagonistic to one holding that to make a valid contract the parties "must be mentally competent to protect their own interests."

3. MASTER AND SERVANT—*when contract creates relation of master and servant.* A contract which contains mutual engagements, on

the one part to employ and on the other to serve, is a contract of hiring and service, and creates the relation of master and servant.

4. SAME—*subsequent insanity of master does not terminate servant's contract.* Where the relation of master and servant exists by reason of a mutual contract of hiring and service, the contract is not terminated by subsequent insanity of the master, as the relation in such case is more than the bare relation of principal and agent.

5. SAME—*inability of master to exercise option of discharge does not terminate contract.* Where a contract provides that the master may, at his option, discharge his servant, the inability of the master, by reason of after-occurring insanity, to exercise his option does not, of itself, destroy the mutuality of the contract or terminate the employment.

6. SAME—*nominal incorporation does not abrogate contract of service.* A contract of employment is not abrogated by the subsequent incorporation of the master's business, where the master retains exclusive control, holds all the shares of stock but two, which are nominally held by others, and carries on the business without change, except in name.

7. PLEADING—*contract price due on executed contract may be recovered under common counts.* The stipulated price due on a special contract may be recovered in *indebitatus assumpsit* where the contract has been so fully executed that only the duty to pay money remains.

8. EVIDENCE—*where special contract is admissible under common counts.* A special contract which has been so fully executed that nothing remains but to pay the amount due, may be admitted in evidence under the common counts.

9. DAMAGES—*when contract price as measure of damages is not waived by evidence of reasonable worth.* Where the defense to an action to recover the contract price for services would, if sustained, make the contract void *ab initio*, or show it to have been abrogated before the service was completed, plaintiff does not waive his right to claim the contract price by introducing evidence in rebuttal as to the reasonable value of his services.

10. LAW AND FACT—*rule for assessing damages is a question of law.* The question of the amount of damages allowable in a suit is a question of fact conclusively settled by the finding of the Appellate Court, but the rule for assessing damages in a particular case is a question of law, and reviewable by the Supreme Court.

11. TRIAL—*time when defendant shall make his opening statement is a matter of discretion with the court.* Whether the defendant shall be allowed to reserve his opening statement until the plaintiff has rested his case, or be required to make it immediately following that of the plaintiff, is a matter in the discretion of the trial court.

*Sands* v. *Potter*, 59 Ill. App. 206, affirmed.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Kane county; the Hon. C. W. UPTON, Judge, presiding.

CHARLES WHEATON, and MARK SANDS, for appellant.

C. F. IRWIN, and BOTSFORD & WAYNE, for appellee.

Mr. JUSTICE BAKER delivered the opinion of the court:

Obadiah Sands, the appellant, was engaged in the business of making, buying and selling butter and cheese. On January 30, 1891, he and Charles H. Potter, the appellee, entered into a written contract, as follows:

"This agreement, made this thirtieth day of January, A. D. 1891, between O. Sands, of Chicago, Ill., party of the first part, and C. H. Potter, of Elgin, Ill., party of the second part:

"*Witnesseth:* That in consideration of one dollar to each in hand paid, the receipt whereof is hereby acknowledged, the party of the first part hereby agrees to employ the party of the second part for a period of three years, and to pay said second party the sum of $1800 per annum, payable monthly, and also to pay said second party five per cent of the first $20,000 of the profits of his butter, cheese and creamery business, and also ten per cent of the next $10,000 of the profits of his business, and twenty per cent on all profits in excess of $30,000 per annum, payable annually. Said second party agrees to give his time and services, to the best of his abilities, to the interest of the business, under the direction of said first party. It is further mutually agreed by and between the parties hereto, that said first party can, at his option, terminate this contract at any time. If this agreement should at any time be terminated by the said first party, he shall pay as damages for such termination $150 at time of such termination, and shall pay said second party his percentage of the profits of said business for the term of six months after such termination of this agreement.

O. SANDS,

C. H. POTTER."

Witness: E. D. SULLIVAN.

Appellee at once entered the employment of appellant under this contract, and continued for the designated

period of three years to do such work as he was directed. He attended to the purchase and sale of butter and to watching the market on the board of trade of the city of Elgin, at times manipulating the market so as to raise the price of butter artificially; he bought and sold butter otherwise than on said board; sold cheese; made various trips east and on the road in effecting sales of butter and cheese and building up a trade; carried on correspondence in furtherance of the same objects; assisted in making purchases of additional creameries, and did other work when required. He had nothing to do with operating the creameries or manufacturing butter or cheese. During the three years of the employment of appellee the business of appellant was much more successful than it had been previously. The profits of the business for said three years were as follows: For 1891, $35,841.59, for 1892, $47,883.39, and for 1893, $52,490.76. The transactions of the three years aggregated $600,000 for the first year, $800,000 for the second year and $850,000 for the third year. At the end of the three years appellee left the employment of appellant, and shortly thereafter brought this suit to recover the moneys that he claimed still to be due him. The results of a jury trial in the Kane circuit court were a verdict and a judgment for $14,000 damages in favor of appellee, and the judgment was afterwards affirmed in the Appellate Court for the Second District.

The principal ground of defense relied on at the trial was that the contract of January 30, 1891, was void, because entered into by appellant while he was insane or without mental capacity sufficient to make a valid contract. The fact that appellant at that time had sufficient mental capacity to execute the contract is conclusively established by the verdict of the jury and the judgments of the courts below. A contention, however, is made that the verdict was induced by erroneous instructions of the trial court given in that behalf at the instance of the

court below. One of them told the jury that to impeach the written contract for want of mental capacity it must be shown, by a preponderance of evidence, that "the defendant, at the time he executed it, had such a degree of mental weakness that he was incapable of understanding what he was doing and unable to comprehend and understand the terms and effect of the contract, or that the same was procured by some undue influence." Another of them read as follows:

"The jury are further instructed, that although they may believe, from the evidence, that either before, at the time or after the making of the written contract in question defendant had insane delusions on some subjects, yet if the jury further believe, from the evidence, that such delusion was in no way related to the plaintiff or the subject matter of the contract here in question, and that in making such contract defendant was in no means influenced thereby, but that in the making of said contract he possessed mind, memory and senses sufficient to know and comprehend the scope, force and effect of that contract, then he was mentally capable of making said contract, and the jury should so find."

The criticism made upon these instructions is, that they did not explicitly state that defendant must have had "sufficient mental capacity to protect his own interests in executing the contract." We are not aware that there is any fixed formula of words in which the mental capacity or incapacity of a person to make a contract must be expressed. It is true that in the case of *Lindsey* v. *Lindsey*, 50 Ill. 79, in passing upon the question of the mental imbecility that would invalidate a contract, this court said, that "in the absence of undue influence there must be such a degree of mental weakness as renders a party incapable of understanding and protecting his own interests," and that like language is used in some subsequent cases. But in the *Lindsey case* it is also said that the contract cannot be impeached "if the contracting

party still retains a full comprehension of the meaning, design and effect of his acts." In *Miller* v. *Craig*, 36 Ill. 109, it is said that mere mental weakness will not authorize a court to set aside a contract if such weakness does not amount to inability to comprehend the contract and is unaccompanied by evidence of imposition or undue influence, and that such is the tenor of all the authorities. Like language is used in *Willemin* v. *Dunn*, 93 Ill. 511. In *Kimball* v. *Cuddy*, 117 Ill. 213, the words, "a full comprehension of the meaning, design and effect of his acts," are used as designating the degree of mental capacity existing where the contract is valid, and the expression, such "mental weakness as renders the maker of the deed incapable of understanding and protecting his own interests," is used in designating the degree of incapacity required to render the contract invalid.

It is difficult to apprehend how one can "comprehend and understand the terms and effect of the contract," or, in making it, possess "mind, memory and senses sufficient to know and comprehend its scope, force and effect," without being "mentally competent to protect his own interests." This latter phraseology is used in several of the instructions given at the instance of appellant. The legal principle involved in the case is embodied in each set of the instructions,—as well those given on motion of appellee as those given on motion of appellant, and the jury had the benefit of the rule of the law expressed in both forms of phraseology. It was not error to give the instructions asked by appellee.

It is urged it was error to refuse to instruct the jury that if the defendant was mentally incompetent to protect his own interest in making the contract, then, although they may believe he understood the same, yet they should find he was not mentally competent and that the contract was invalid. The terms of the instruction are contradictory, and it was likely to mislead the jury by inducing them to believe that although the defend-

ant fully understood the contract, yet that if he did not have sufficient mental acumen to foresee that his business would so increase as that the per cent of the profits agreed to be paid for appellee's services would amount to the large sum it did, and provide against such contingency, then they should find against the validity of the contract. There was no error in refusing it.

It is claimed that if the contract was valid in its inception, yet it was terminated in August, 1891, by appellant exercising the option for which provision was made therein. No contention is made that the rulings upon the instructions relating to the annulment of the contract by the act of appellant were erroneous. The testimony was conflicting upon the question whether appellant ever attempted to exercise the option given him, and the alleged fact of its exercise is conclusively negatived by the judgments we are called upon to review.

In December, 1892, appellant was adjudged insane and was taken to the asylum at Elgin. His wife was appointed conservator. In January, 1894, it was adjudged that he was restored to his reason and the conservator was discharged. The court refused the motion of appellant to instruct the jury that the insanity of the principal terminates an agency, and that if they found, from the evidence, that the defendant became insane after the making of the contract in controversy, they should find that such contract was then terminated. This refusal is claimed as error, and reliance is placed on Mechem on Agency, (secs. 553, 554,) and other authorities, which hold that the after-occurring insanity of the principal operates as a revocation or suspension of the authority of an agent exercising a bare power of authority. The rule in question is not decisive of the rights of the parties to this controversy. The legal relation here involved is not the bare relation of principal and agent, but the relation of master and servant, under a mutual and binding contract. The written contract of January 30, 1891, estab-

lished the latter relation between the parties. It was a contract of hiring and service, and there were mutual engagements,—on the one part to serve and on the other to employ and pay. The fact that one party to a contract becomes insane during its performance does not necessarily either suspend or annul such contract. If appellee's services were worth $5000 a year over and above what he was receiving under the contract, it would hardly be contended that immediately upon the adjudication of insanity he could have abandoned the contract and gone into the service of a rival dealer in butter and cheese without incurring any liability to appellant for so doing. One party cannot be held bound and the other released. The statute (chap. 86, sec. 12,) provides that the conservator, by permission and subject to the direction of the court which appointed him, may perform the personal contracts of his ward made in good faith and legally subsisting at the time of the commencement of his disability and which may be performed with advantage to the estate of the ward, and we know of no rule of law which would relieve the estate of an insane person from liability and damages for the non-performance of a valid contract of such insane person.

But it is urged the right to declare an option, under the contract, was personal to appellant and to be exercised only by him, and therefore the rights under the contract were no longer mutual. The mutual engagements of hiring and paying and of service still remained, and even if one of the parties, without any fault of the other, was disabled from availing of the option that was given him in addition thereto, we know of no rule of law that would necessarily abrogate such mutual engagements. However, a court of chancery would, in a proper case, authorize the conservator to exercise the option on behalf of his ward, and possibly even the county court which appointed the conservator and has charge of the administration of the estate of the ward could make all

necessary and proper orders in the premises. Our conclusion is, there was no error in refusing the instruction.

It appears that in May, 1891, appellant caused a corporation, known as the Elgin Creamery Company, to be formed, and that thereafter that name was used in the business. At the trial of this cause and at the close of the evidence he moved to exclude all evidence of the services rendered or the value of them after the formation of such corporation. This motion was overruled and an exception taken. The court also instructed the jury as follows:

"Although the jury may believe, from the evidence, that on or about May 4, 1891, there was an incorporation effected by the name of the Elgin Creamery Company, and that such name was afterwards used in connection with the business of defendant, yet if the jury further believe, from the evidence, that such corporation was formed for the purpose of convenience or policy in conducting defendant's business, that after its formation business was in fact carried on by O. Sands, and without change except as to using such corporate name, and that the plaintiff's employment remained the same as before, and that there was no understanding or agreement between the defendant and plaintiff that the formation of said corporation should affect the plaintiff's employment in duties or compensation under the written contract in question, then such creation of said corporation and the use of such corporate name would not affect the rights of the plaintiff in said written contract."

It appears from the evidence that in the shipments of product and in the correspondence relating to the business before May 1, 1891, the name "Boone County Butter Company" was used, and after that date that of "Elgin Creamery Company" was in use, but it also appears from the evidence that there was no change otherwise in the manner of conducting the business. All the capital invested in the business, before and after, was furnished

by appellant. All the contracts and purchases of creameries were made in his name. The bank account was kept in his own name and all checks were signed with his name, and all the profits received from the business were received and appropriated by him. The manner of keeping the books was not changed and no dividends of the company declared or paid. Appellant subscribed for 498 of the 500 shares of capital stock, and the other two shares were subscribed for, one share each by two employees of his, and neither of said employees ever paid for or was the real owner of any share, but each of them nominally held one share in order to qualify them, respectively, to act as directors. He was always the real owner of all the shares and all the shares continuously stood in his name, except the few that necessarily, but nominally only, were transferred to his employees and attorneys in order they might be directors and he enabled to perpetrate a fraud on the statute. Under this showing we agree with the Appellate Court that the incorporation of the Elgin Creamery Company was a mere nominal affair, and that the contract between appellant and appellee was not abrogated because of its formation. The creamery company was a mere means or mode adopted by appellant for conducting his own individual business—a mere instrument or tool used by him for that purpose. (*West Chicago Street Railroad Co.* v. *Morrison, etc. Co.* 160 Ill. 288.) No reason is perceived why appellant, who, under his contract, was entitled to the services of appellee for three years, could not direct appellee to work for him (appellant) in and about his (appellant's) business, which he owned and carried on in the name of Elgin Creamery Company.

We think there was no substantial error in any of the rulings of the trial court upon this branch of the case.

The declaration contains the common counts only. One of the assignments of error is, that the circuit court allowed the plaintiff to introduce in evidence his spe-

cial contract under the common counts, there being no special count on the contract; and it is also assigned as error that the jury was instructed that if the evidence shows that appellee well and faithfully performed all services that were required of him by the terms of the contract, then he is entitled to recover the full compensation therein agreed to be paid for such services. While a contract continues executory the plaintiff must declare specially, but when it has been fully performed on his part, and nothing remains to be done under it except for the defendant to pay, the plaintiff may, at his election, declare generally in *indebitatus assumpsit.* (*Lane* v. *Adams,* 19 Ill. 167; *Throop* v. *Sherwood,* 4 Gilm. 92; *Tunnison* v. *Field,* 21 Ill. 108; *Adlard* v. *Muldoon,* 45 id. 193.) And the stipulated price due on a special contract may be recovered in *indebitatus assumpsit* where the contract has been so completely executed as that only the duty to pay the money remains. (*Adlard* v. *Muldoon, supra; Illinois Linen Co.* v. *Hough,* 91 Ill. 63.) There was no error, then, in admitting the written contract in evidence, or in instructing the jury that in the event of a right of recovery the measure of damages would be the contract price.

Appellee did not waive his right to claim the contract price as the measure of damages simply because, in rebuttal, he introduced evidence tending to show what his services were reasonably worth. In part the defenses made were, that the special contract was void *ab initio* because of appellant's insanity, that it was subsequently terminated by his exercising his option, and also that it was abrogated by his after-insanity. If either of these defenses were sustained, then appellee, for all or a part of his services, could recover only on a *quantum meruit,* and it is manifest the introduction of the testimony in rebuttal was not an abandonment of the contract price, but a provision to meet any contingency that might follow the findings of the jury on the issues.

It is claimed that the expense account of appellee, amounting to $1052.51, should have been charged to appellee, because the contract made no provision for it. Appellee testifies that after the making of that contract appellant informed him that he expected to pay his expenses, and that the first money that appellant paid him was a $50 check for expenses to go to New York on his business. However, it is useless to pursue the subject, for no question of law in regard to this expense account is preserved for our consideration, either by objection to testimony, ruling upon instructions, or otherwise.

It is argued quite at length that even upon the theory of a right to recover, as a part of the compensation of appellee, the rates per cent on the profits of the business, yet the assessment of damages by the jury was excessive. The question of the amount of damages is a question of fact, and upon it the decision of the Appellate Court is final and conclusive. It is true, however, that the question what is the measure of damages, or what is the rule for assessing the damages in a particular case, is a question of law. *City of Joliet* v. *Weston*, 123 Ill. 641; *Barclay* v. *Warne*, 143 id. 19.

It is claimed that in the schedule of profits upon which the verdict was based, sufficient reductions were not made in either year from the gross receipts of that year. It is conceded, that the compensation of appellee was computed by the jury upon the profits as shown by the books of appellant himself, and by the testimony of Sullivan, his book-keeper. One Kingswell, an accountant and book-keeper, was produced by appellant as a witness, and he stated he thought it a very proper thing to allow an annual depreciation on the plants as a deduction from profits, and that he would consider the profits to be that which was earned over and above interest on the money invested as capital in the business, but he also testified there is no general rule, and almost as many different ways as there are different book-keepers, and a great

many theories and different methods. The court refused to give an instruction which assumed that whatever said Kingswell had testified was a proper thing was to be implicitly followed as the rule of the law in the premises. The court virtually left it for the jury to determine, from all the evidence in the case, including that afforded by appellant's own books and the testimony of his bookkeeper, what was contemplated by the contract as the profits of the business. We find no error in refusing to give the instruction that was submitted by appellant in that behalf.

In the bill of exceptions the following appears: "The plaintiff's counsel having closed his opening statement on the part of the plaintiff, Mr. Wheaton, counsel for the defendant, stated as follows: 'The counsel for the defendant reserve their opening statement to the jury on the part of the defendant until the plaintiff shall have closed his case and the defendant is called upon to put in his defense.' To which the counsel for plaintiff objected. Thereupon the court held that if the counsel for the defendant desired to make an opening statement to the jury on the part of the defense he has to make it now, at the close of the opening statement of the counsel for the plaintiff. To which ruling of the court defendant, by his counsel, then and there excepted." Whether or not counsel for appellant made an opening statement to the jury, and if he did at what time he made it, are matters upon which the record is silent. The practice in this State has always been such as is indicated by the ruling of the trial court. On the other hand, according to the usual course of practice at common law, the opening statement of the defendant is not made until the evidence of the plaintiff has been heard and the plaintiff has rested. In view of the practice that has so generally prevailed in this State from its organization, it must be held that it is a matter within the discretion of the trial court whether a defendant shall be allowed to reserve

his opening statement until the plaintiff has closed his evidence, or be required to make it immediately upon the heels of the opening statement of counsel for the plaintiff. There was no error in the ruling of the court in that behalf.

We find in the record no sufficient ground for reversing the judgment of the Appellate Court. It is affirmed.

*Judgment affirmed.*

Mr. JUSTICE CARTWRIGHT took no part.