THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. BENJAMIN A. ARNOLD, Plaintiff in Error.

*Opinion filed December 21, 1910—Rehearing denied Feb. 9, 1911.*

1. CRIMINAL LAW—*affidavits of grand jurors made to show occurrences before them are not considered.* Affidavits of grand jurors cannot be considered by the court for the purpose of showing occurrences before them, such as the presence of more than one witness at the same time.

2. SAME—*when presence of two witnesses in grand jury room at same time is not harmful.* The proceedings before a grand jury must be kept secret and one witness cannot be present during the examination of another, but the fact that two witnesses were present at the same time is not a substantial violation of the rule, where there was practically no examination of the witnesses in each other's presence and nothing occurred that could prejudice the accused.

3. SAME—*whether accused may reserve opening statement is a matter of discretion with court.* Whether the accused shall have leave to reserve his opening statement until after the evidence for the People has been heard is a matter resting in the discretion of the trial court, and if no reason is given for deferring the statement, and none is apparent, there is no abuse of discretion in denying the leave.

4. SAME—*it is the duty of the trial court to compel decorum in the court room.* The trial court has power to compel such decorum in the court room during the trial as will inspire respect for the proceedings, and it is its duty to exercise such power rather than merely to give advice and suggestion.

5. SAME—*opening statement should not be permitted to become an argument.* The office of an opening statement is to advise the jury concerning the questions of fact involved so as to prepare the minds of the jurors for the evidence to be heard, and it is not intended to be, and should not be, permitted to become an argument, nor an argument mixed with epithets and vituperation.

6. SAME—*what is improper in State's attorney's opening statement.* The reputation of the accused cannot be an issue in the case unless he chooses to make it so, and if it is not an issue it is improper for the State's attorney, in his opening statement, to tell the jury that the accused had a right to offer testimony of his good character, but that if he did so the People would bring witnesses who knew his reputation from the top of his head clear down to the soles of his feet, and would show what that reputation was.

7. SAME—*the court may limit number of witnesses concerning character of accused.* The trial court has no power to limit the number of witnesses to be heard on a side as to a controlling fact or facts and circumstances bearing thereon, but it is not error to fix a reasonable limit concerning collateral matters, such as evidence of the good character of one accused of rape.

8. SAME—*what does not tend to show an admission of guilt of crime of rape.* The fact that the defendant in a prosecution for rape made no complaint against the girl's father (who had been arrested for fighting with the defendant) when told by a police officer that if he made complaint the father would charge him with committing a rape on his daughter has no tendency to show an admission of guilt such as justifies the introduction of evidence concerning the fact of the fight, which took place about ten months after the alleged rape, and was occasioned because of the father's being informed that defendant had slandered his daughter about another and independent matter.

9. SAME—*hypothetical question should not assume ultimate fact which jury is to determine.* Where evidence of a hemorrhage is offered as tending to prove the ultimate fact of forcible rape, and the defendant, by hypothetical questions to expert witnesses, seeks to show that the hemorrhage might have been due to a recent ovarian operation, it is error to allow the State's attorney, on cross-examination, to add to the hypothesis of fact the assumption that there had been a forcible rape, and require the witnesses to give their opinion as to whether the hemorrhage was the more likely to have resulted from the rape or the operation.

10. SAME—*when exhibiting blood-stained clothing in rape case is error.* Exhibiting to the jury, in a rape case, the blood-stained clothing of the prosecuting witness is error, where the fact of the hemorrhage was proved and not denied but the cause thereof was claimed by the defendant to have resulted from an ovarian operation which the prosecuting witness had undergone shortly before the alleged rape and from which she had not fully recovered.

11. INSTRUCTIONS—*when an instruction as to considering testimony of accused is erroneous.* An instruction in a criminal case telling the jury that they "are not required to receive blindly the testimony of such accused person as true, but you are to consider whether it is true and made in good faith, or false and made only for the purpose of avoiding a conviction," is erroneous.

12. SAME—*the court has no right to disparage testimony of accused.* Where one accused of crime becomes a witness he is in the same position as any other witness, as any witness may be disinterested or have an interest, near or remote; but his interest is different from that of other witnesses, and it is proper for the court, in an instruction, to point him out and direct the jury to

take his interest into account as affecting his credibility, but the court has no right to discredit or disparage his testimony.

13. SAME—*limit of the jury's privilege to disregard entire testimony.* The privilege of disregarding the entire testimony of a witness is confined to cases where the jury find that such witness has knowingly and willfully testified falsely to a material matter and is without corroboration.

14. SAME—*instructions stating presumptions of fact may be refused.* Instructions in a criminal case which recite particular facts and declare that such facts raise certain presumptions, which are presumptions of fact and not of law, are properly refused.

WRIT OF ERROR to the Circuit Court of Stephenson county; the Hon. RICHARD S. FARRAND, Judge, presiding.

ROBERT P. ECKERT, and AMOS W. MARSTON, for plaintiff in error.

W. H. STEAD, Attorney General, and LOUIS H. BURRELL, State's Attorney, (DOUGLAS PATTISON, of counsel,) for the People.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

At the March term, 1910, of the circuit court of Stephenson county, the plaintiff in error, Benjamin A. Arnold, a physician and surgeon living in Freeport, in said county, and practicing there, was found guilty by a jury of the crime of rape upon Alta Rosenstiel on July 8, 1908, when she was fifteen years and eleven months of age, and his punishment was fixed at imprisonment in the penitentiary for the term of four years. He was sentenced in accordance with the verdict.

There was a motion to quash the indictment on the ground that Alta Rosenstiel and her father and mother were all present in the grand jury room at the same time. The proceedings before a grand jury must be kept strictly secret, and that could not be done if witnesses should be

present during the examination of each other. The rule, therefore, is, that one witness must never be permitted to be present at the examination of another. (17 Am. & Eng. Ency. of Law,—2d ed.—1204.) The court refused to consider the affidavits of grand jurors with reference to the alleged fact and did not thereby commit error. (*Gitchell v. People,* 146 Ill. 175.) What occurred was proved, however, by other witnesses, and there was no substantial violation of the rule. The father was in the grand jury room at a time when some cloths that had been used were identified, for the alleged reason that the girl was timid and unable to appear alone in respect to a matter of that kind, but there was practically no examination of witnesses in the presence of each other. There could have been no prejudice to the defendant from anything that occurred before the grand jury, and the court did not err in refusing to quash the indictment.

There is much complaint concerning the examination of persons summoned as jurors, for the purpose of ascertaining their qualifications, including questions asked by the court; and in the same connection objection is made to questions asked by the court and remarks made in the course of the trial. Without going into unnecessary detail, it is sufficient to say that the complaints are unfounded. The court did not take any more part in the trial than was proper, but in our opinion did not participate in the proceedings to the extent that would have been desirable for the attainment of justice.

After the opening statement by the State's attorney the attorneys for the defendant asked leave to reserve their opening statement until after the evidence for the People had been heard, but the court refused such leave. It was a matter resting in the discretion of the court. (*Sands v. Potter,* 165 Ill. 397; *Sinclair Co. v. Waddill,* 200 id. 17.) No reason was given for deferring the opening statement for the defendant and none is apparent, so that there is no

reason for saying that the discretion was abused or the defendant injured by the ruling.

So far as the material facts were not in dispute at the trial they are as follows: Alta Rosenstiel was the daughter of a farmer, living with her parents between five and six miles north-west of Freeport. The defendant was the family physician, and at different times in the spring of 1908 was consulted with reference to troubles of the girl, consisting of pains and soreness in her side, which were diagnosed as appendicitis, and on May 18, 1908, he performed an operation on her at the hospital in Freeport. The difficulty was appendicitis, and the right ovary was also found to be diseased and a part of it was removed. When the girl left the hospital she was not fit to go home and was taken to the home of the defendant, where she was cared for by his wife for a time and then returned to the farm. Afterwards she visited the defendant at his office with her parents occasionally, for consultation and treatment. The defendant also called at the farm while visiting patients in the neighborhood, or at the call of the parents, several times in the early part of July. The last call was on July 8, 1908, at about eight o'clock in the morning, when he happened to be in the neighborhood. The girl was in bed in a bed-room on the ground floor, and he examined the wound and the condition of her side and prepared new medicine, and soon afterward washed his hands at the summer kitchen and left. The mother was about the house, and most of the time while defendant was there was in the summer kitchen. The doors were all open between the bed-room where the girl was and where the mother was, and there were several carpenters working close to the house in the yard, framing timbers for a barn. The mother and men were all within call from the bed-room. The girl got up and was sitting on the porch, and about an hour and a half after defendant left her mother went to the bed-room and found a blood stain about the

size of the palm of her hand on the bed and also stains upon the girl's night gown. After asking the girl twice, she stated to her mother the alleged act of the defendant. There was a considerable hemorrhage, which lasted for two or three days. The defendant weighed 180 pounds and the girl 110. In the following spring or summer of 1909 the defendant sent a statement of his account to the father of the girl, and the mother dictated a letter, which the girl wrote, which was not dated but post-marked September 25, 1909, saying: "When you want that bill you hold against us, sue it, and the public will know more about your damnable character than they already know.—Mrs. Rosenstiel." On the morning of October 2, 1909, a collector and an attorney called at the farm with the bill, and the father said that if the defendant wanted the money to go ahead and sue it, but that if he did, he would bring a charge against him. Upon the return of the collector to Freeport the defendant sued out a summons against the father, and upon the summons being served the bill was paid. On October 4, 1909, the defendant was arrested upon a warrant issued upon a complaint made by the girl before a justice of the peace, and this was nearly fifteen months after the offense was alleged to have been committed.

The matters which were in dispute at the trial were these: The mother and the girl testified that after the defendant had made the examination and gone to get a drink of water he went back into the bed-room, saying that his team was tired and he would go in and talk with the girl a few minutes and let them rest. The girl testified that he sat down on the bed and then laid down by her and then committed the offense by force; that she tried to call her mother but could not; that she was so frightened, full of pain and paralyzed that she could not make any outcry, and that after the offense was committed, her mother, who was attending to the baking, came to the door of the bed-room and the defendant led the mother out through the house.

The mother testified that she came to the door and was led out or backed out, and the defendant then washed his hands and left. The mother knew nothing and heard nothing of any trouble until the girl told her in answer to the inquiries, and she testified that after learning of the act she called up the defendant's office at Freeport by telephone, but he was not there; that he called her by telephone before the noon hour and asked her how the girl was, and she answered that he ought to know, and she wanted to see him just as soon as possible. The father and mother both testified that when the former came home, about ten o'clock, from the creamery, he was informed of the facts, and he testified that on the afternoon of that day he drove to Freeport to find the defendant to kill him but the defendant was not at his office. They both testified that the next day they went to Freeport, leaving home about one o'clock, and called on the defendant at his office; that the father said, "You have been monkeying with that girl of ours;" that he denied it and said he had a notion to commit suicide because he was accused, and that he then said the girl was guilty of certain conduct, which it is claimed was an admission, by implication, of a voluntary act. The mother testified that on the Friday or Saturday after July 8 the defendant telephoned her that they should come in and he would fix it up, and the father testified that about the last of July he went to the defendant's office and referred to the telephone message that they should come in and fix the thing up, and wanted to know of the defendant what he wanted to fix and what they should do, and the defendant said that they would drop the matter and he would go on and be their doctor, but the father said they would see about it, and left. The defendant denied that he went back into the house on July 8 after the examination, but testified that he washed his hands to remove any odor after the examination, and left. He denied that he committed the offense and denied every incriminating circumstance testi-

fied to. The book-keeper in the office testified that there was no call by telephone from the mother, and the defendant denied that he called the mother by telephone or that any visit was made by the father and mother to his office. According to the testimony for the prosecution, the father and mother left home about one o'clock and went directly to the office of the defendant, but it was proved that about the time they would reach the office, and for a good part of the afternoon, the defendant was a considerable distance in the country making a visit, which occupied a good part of the afternoon. The defendant testified that on the morning of July 8 he agreed to prepare a medicine which was to be called for, and did so, and he was corroborated by evidence that the medicine was called for on July 14. As to the telephone calls and matters alleged to have occurred at the defendant's office, his testimony was supported by that of the employees in the office, but as to the actual occurrence the only evidence was that of the girl and the defendant, which the jury were called upon to consider in the light of the surrounding circumstances. Those circumstances were, that the bed-room was on the first floor of the house; that the door and all other doors were open; that the mother was in the house or summer kitchen; that a number of workmen were within less than one hundred feet of the building; that the mother and workmen were within easy call, and that any alarm or outcry would have brought assistance to the girl and certain detection and punishment to the defendant. The reason given by the girl for not giving any alarm was fright and pain, which rendered her unable to make any outcry, and the jury were required to consider the sufficiency of that reason as well as the fact that no complaint was made after the defendant had left the premises until the girl was interrogated by her mother. The reason given was entitled to fair consideration, but did not affect the probability of the defendant committing the act under such conditions. Such an act

would be so different from the natural order of things as to occasion surprise in the mind of any person and perhaps engender doubts. There was no attempt at secrecy usual in such cases nor any precaution whatever such as would be expected of a person of ordinary intelligence, and this would be so whether the defendant had reason to anticipate resistance or not. Even if the defendant expected the act would be voluntary on the part of the girl, the mother was liable to come in at any moment, and nothing was done or any arrangement made which would render it improbable that she would become a witness to the act. Another material question to be considered by the jury was whether one situated as the defendant was, would, if he had been guilty of a felony, have brought upon himself a prosecution for his crime for the mere sake of collecting a bill of $142.50 when the charge would not otherwise have been made. It was proved that the defendant had a large and lucrative practice and was not apparently in need of money, and if guilty could have secured immunity from punishment for the amount of his bill. In considering these questions the defendant was entitled to a fair trial upon legitimate evidence and with proper instructions.

The trial was somewhat disorderly, with much bickering of the attorneys and but little exercise of authority by the court. The court presiding over a trial has power to compel such decorum in his court room as will inspire respect for the proceedings, and the exercise of such power, rather than mere advice and suggestion, is a duty. The office of an opening statement is to advise the jury concerning the questions of fact involved, so as to prepare their minds for the evidence to be heard, (1 Thompson on Trials, 267; *Pietsch* v. *Pietsch*, 245 Ill. 454;) and it is not, and should not be, permitted to become an argument. In this case the State's attorney, in the opening statement, indulged in epithets, vituperation and argument, and on objection was not restrained, as he should have been. He also told

248—12

the jury that the defendant had a right to offer testimony of his good character, and if he did they would bring witnesses who knew his reputation from the top of his head clear down to the soles of his feet and would show what his reputation was. The reputation of the defendant was not an issue in the case and could not be unless he chose to make it so, and the challenge and assertion were improper. The defendant afterward offered evidence of good character, and it is objected that the court erroneously limited the number of witnesses which he was permitted to call to twenty-five. The court fixed that limit for each side, and while a court has no power to limit the number of witnesses to be heard as to a controlling fact, or facts and circumstances bearing thereon, it is not error to fix a reasonable limit concerning collateral matters, such as this was. (*Green* v. *Phœnix Mutual Life Ins. Co.* 134 Ill. 310.) After the defendant had examined twenty-five witnesses to prove his good character his attorneys tendered to the court four hundred more, offering to give their names. The prosecution then examined twenty-five witnesses and made a tender of six hundred more, whereupon the attorneys for the defendant made a tender of one thousand additional witnesses. The question of reputation, beginning with a challenge, finally degenerated into a competition in offers of attorneys.

Error was committed in rulings on the admission of evidence. The State's attorney was allowed to prove by the father of the girl that on May 22, 1909, he went to defendant's office and they had a fight because some one had told the father that the defendant had slandered the girl by saying she was loose. This was more than ten months after the alleged act and about another and independent matter. The only excuse offered now is, that the whole story was admissible for the purpose of showing that the defendant afterward practically admitted his guilt to a police officer. The father was arrested and taken to the po-

lice station, and the defendant, upon notice, went there and was asked if he wanted to make a complaint. The officer testified that he told him if he made a complaint against the father the father would bring a charge against him of rape on his daughter, and that the defendant said, "Give him a scare and let him go." The defendant testified that the police officer told him that the father would bring a serious charge against him but did not indicate what it was, and that he did not know there was a charge of rape until he was arrested, but if the police officer was correct the fact had no tendency whatever to prove guilt. The police officer did not make any charge or assert the truth of any charge, and the defendant might naturally have preferred not to make any charge against the father rather than to have a charge brought against himself, whether of slandering the girl or some other charge, and regardless of guilt or innocence.

The evidence of the hemorrhage was offered as tending to prove the ultimate fact of a forcible rape, and the defendant proved that there was another possible cause of the hemorrhage as an irregular flow in consequence of the operation on the ovary and the removal of a part of the same. This was done by the testimony of experts, in answer to hypothetical questions based on the fact of the operation. The court permitted the State's attorney, on cross-examination of these witnesses, to add to the hypothesis of fact the assumption that there was a forcible rape on the girl, and require answers whether in their opinion the hemorrhage was more likely to have resulted from the forcible rape or the operation. The only purpose of the direct examination was to show that the hemorrhage did not necessarily result from a rape, and to permit the State's attorney, in cross-examination, to assume the existence of the ultimate fact which the jury were to determine, was a palpable violation of the rules of evidence. If the defendant was guilty of a forcible rape, as assumed in the hypothetical

questions put to the witnesses, the question whether the hemorrhage came from that cause or from the operation was of no consequence. The fact that the hemorrhage occurred and the flowing lasted for two or three days was proved and not denied, but the stained cloths and clothing before referred to, which were before the grand jury, were admitted in evidence against defendant's objection and were displayed to the jury during the trial. They were not the instruments of any crime and had no tendency to prove any fact except that the hemorrhage occurred, which was not in controversy. The exhibition was necessarily prejudicial to the defendant and would create a prejudice which it would be impossible to meet and overcome. It should not have been permitted.

Instructions were given which were erroneous and prejudicial to the defendant. The twelfth instruction, after telling the jury that the credibility of the defendant was a matter for them and detailing matters to be taken into consideration in weighing his testimony, including his interest in the result of the case, concluded as follows: "You are not required to receive blindly the testimony of such accused person as true, but you are to consider whether it is true and made in good faith, or false and made only for the purpose of avoiding a conviction." When a person accused of crime becomes a witness he is in the same position as any other witness, and any witness may be either disinterested or have an interest, near or remote. The interest of the defendant is of a different character from that of any other, and it is therefore proper to point him out in an instruction and to direct the jury to take into account his interest as affecting his credibility, but the court has no more right to disparage or discredit his testimony than that of any other witness. Such an instruction as this, concerning any other witness having an interest in the result of a case, would not be regarded as proper, and the instruction falls under the condemnation of *Hellyer* v. *People*, 186 Ill.

550. The words quoted were the ground for a reversal of the judgment in *Donner* v. *State,* 72 Neb. 263. The instruction had the effect to prejudice the testimony of the defendant by telling the jury they were not required to receive it blindly, with the intimation that it might be merely fabricated for the purpose of avoiding a just conviction.

The seventh instruction was the same as the second instruction given in *Taylor* v. *Felsing,* 164 Ill. 331, with the omission of the words, "or has knowingly testified falsely." The instruction in that case was not considered as harmful to the defendant on account of there being no conflict in the evidence on the main features of the case and in view of another instruction, but it is not an accurate statement of the law. As confined to a particular fact an instruction of that kind would be unobjectionable, as was said concerning the third instruction in *Taylor* v. *Felsing, supra.* The jury would not be required or expected to believe any particular thing testified to by a witness as a fact to be a fact which, from all the evidence before them, they believe is not a fact. (*Goss Printing Press Co.* v. *Lempke,* 191 Ill. 199.) This instruction was not limited to a particular fact or facts but applied to the entire testimony of a witness, and, in effect, authorized the jury to disregard it if the witness appeared to be mistaken or his testimony for any other reason appeared to be untrue or unreliable. The privilege of disregarding the entire testimony of a witness is confined to cases where the jury find that such witness has testified, knowingly and willfully, falsely as to a material matter and is without corroboration. The instruction might not be cause for a reversal of a judgment, but it is not correct.

The court modified some instructions offered by the defendant but did not err in so doing. The court also refused a large number of instructions which recited particular facts, such as the situation of the parties at the time, the doors being open and other persons near by, and

declared that such facts raised certain presumptions. The matters stated were proper for the jury to take into account in determining the ultimate fact and for the court in passing upon a motion for a new trial, but they were presumptions of fact and not of law, and the court did not err in refusing them.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*