(No. 12493.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LEE C. HARVEY, Plaintiff in Error.

*Opinion filed February 20, 1919.*

1. CRIMINAL LAW—*when an autopsy may be held.* An autopsy upon a dead body should be held only in proper cases, under the direction of the coroner or at the request of the relatives.

2. SAME—*an instruction should not assume controverted facts.* Where the crucial question in a criminal case is whether injuries found upon a dead body were the cause of the death, upon which the evidence is conflicting, it is error to give an instruction assuming the controverted facts to be true in attempting to define murder or manslaughter, although another instruction was given which stated the same facts hypothetically.

3. SAME—*instruction should not tend to discredit testimony of defendant.* An instruction should not tend to discredit the testimony of a defendant and put him in an inferior class from other witnesses nor lead the jury to believe that they are not bound to treat his testimony as the testimony of other witnesses, especially where the testimony of defendant is the only evidence in his behalf.

4. SAME—*weight of expert testimony is to be determined by jury.* The weight to be given the opinions of witnesses testifying as experts is to be determined by the jury from all the circumstances in evidence, and instructions are properly refused which tend to discredit expert testimony.

WRIT OF ERROR to the Circuit Court of Sangamon county; the Hon. E. S. SMITH, Judge, presiding.

JOHN G. FRIEDMEYER, and EDMUND BURKE, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, C. F. MORTIMER, State's Attorney, and NOAH C. BAINUM, (EDWARD PREE, of counsel,) for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

Plaintiff in error, Lee C. Harvey, frequently called in the record Teal Harvey, was found guilty by a jury in the circuit court of Sangamon county of manslaughter in con-

286 – 38

nection with the death of Ida Murray and given an inde-
terminate sentence in the penitentiary. From the judgment
on that verdict in the circuit court a writ of error was sued
out of this court.

The evidence in the record shows that plaintiff in error,
a man forty-eight years of age, conducted a grocery busi-
ness in the city of Springfield. He had been living with
Ida Murray for about eleven years, and she was generally
reputed to be his wife and commonly called Mrs. Harvey
although they had never been lawfully married. They had
lived together before coming to Springfield. He had been
engaged in the saloon business, both in Springfield and in
other places, during the time he was living with Ida Mur-
ray, but he had gone out of the saloon business and opened
a grocery when Springfield adopted the Local Option act
and abolished saloons. At the time of the happenings here
in question he and the woman were living in a flat over
his grocery store, occupying several of the rooms, other
rooms being rented out to other persons. About April 17,
1918, Ida Murray became sick with pneumonia and was
under the care of a physician, Dr. Armstrong, who testi-
fied that she had a severe case of what is usually known
as ordinary pneumonia, requiring attention every day from
him and sometimes twice a day for from ten to twelve
days; that then the fever subsided and she suffered what
the medical profession call "red hepatization" of the lung,
which is common in pneumonia cases; that he had treated
her until about the first of June at her home, and after-
wards she came occasionally to his office until June 14, at
which time she appeared to have had a fairly reasonable
recovery; that during his treatment she often expectorated
blood, this being a condition also which frequently accom-
panies and follows pneumonia. The evidence also tends
to show that after she ceased being prescribed for by Dr.
Armstrong she went to Dr. Compton for treatment. His
testimony as to the condition he found her in before the

occurrences here in question substantially agrees with that of Dr. Armstrong.

On June 29, 1918, Ida Murray spent the afternoon with Josephine Kennedy, who acted as a waitress in a neighboring restaurant and occupied one of the rooms above the grocery store on the same floor on which the Harveys lived. Miss Kennedy was called as a witness in behalf of the State and testified that she and Ida Murray during that afternoon, and up to two o'clock the following morning, spent the time together; that during most of that time they were drinking beer; that between them they drank two cases of beer,—sixty-four bottles in all,—except seven or eight bottles. From her testimony it appears that they made visits to several places near the Harvey home and went to the rooms over the grocery store about eleven o'clock in the evening and continued to drink beer until between two and three o'clock in the morning, when Miss Kennedy went to her room to retire; that at that time she thought Ida Murray was also preparing to retire. The testimony tends to show that plaintiff in error remained in the grocery store until about eleven o'clock in the evening of June 29 and then went in an automobile with a friend named Scott,— an iron salesman,—to a club house a short distance away, where they remained until about four o'clock in the morning and then drove back to Harvey's grocery, where they remained until between six and seven o'clock in the morning, when Scott left; that Harvey had been drinking heavily both before he went to the club house and while there and after he returned to his grocery store; that about five or six o'clock in the morning Ida Murray came down to the store from the rooms above and asked Harvey to come up and go to bed, and that he replied he would in a short time, but apparently did not go up until two or more hours later, waiting for his clerk to come to take charge of the store, but the clerk not coming he apparently went up, between eight and nine o'clock, to his rooms above the store.

Miss Kennedy testified that along about that hour she heard
Ida Murray calling for help and thereafter heard a noise
as if someone had fallen against the wall or on the floor;
that she recognized the voice of plaintiff in error telling Ida
Murray to wait a minute, and heard her say: "Don't do
that! I can't stand it! I can't get my breath!" that she
heard a crash of glass as when a window is broken; that
the deceased then opened the door and went out into the
hallway, saying she was going to get some air, and plain-
tiff in error followed her and said with an oath "she could
get as much air back in her room as she could get there."
It may be stated in this connection that the room that Miss
Kennedy occupied was the second room from the one that
plaintiff in error and the deceased were occupying as a bed-
room at the time these occurrences took place. She testi-
fied that the conversations she heard between the Harveys
were just loud enough to be heard in her room, and it is
apparent that she did not feel impelled to call in help or
go herself to Ida Murray's assistance. She also testified
that later in the morning she asked Ida Murray if Harvey
hit her, and the deceased, by a shake of her head, answered
"No." This testimony was ruled out by the court upon ob-
jection of the State.

Mattie Thomas, a negro servant, was employed by the
Harveys to assist in the housework. She slept elsewhere
and usually came to work between ten and eleven o'clock
in the morning, leaving in the evening after the housework
was done. On the morning in question she testified she
came to work about twenty minutes to eleven and found
the condition of the rooms about the same as usual, except
that there were a number of empty beer bottles and one of
the kitchen windows was broken; that when she arrived
she found Harvey sitting in the kitchen with Ida Murray
on his knee, he having his arm around her and her hand
in his; that she had a black eye and her face was swollen
and seemed scratched; that Harvey said, "Love me," and

Ida Murray reached down and kissed him, and he with an oath said, "Yes, I have made you love me;" that Harvey and the deceased then had an argument about drinking some of the beer that was left, in the course of which he told her, with another oath, that he had a good mind to take that bottle and knock her brains out. He stated in his testimony that he said, in substance, that it would make them even if he should throw that bottle at her, because she tried to strike him before with a beer bottle. Apparently this talk took place during the time she was sitting on his lap, kissing him, and while he had his arm about her and was requesting that she kiss him. Mattie Thomas also testified that while she was in the kitchen Harvey slapped the deceased on the cheek, and the deceased in a weak voice said, "Don't do that;" that thereafter Harvey put his arm around Ida Murray and assisted her to the bed-room and they both lay down on the bed; that Harvey had been drinking quite a good deal and that the deceased seemed very weak; that shortly thereafter witness went to the bed-room and found plaintiff in error on the bed asleep and deceased sitting in a rocking chair, leaning over a slop-jar, very ill; that she made her lie down in the next room and at her request called up Dr. Compton, and, apparently as he was not able to come at once, witness called a cab to take Ida Murray to the hospital, and when the driver came it was found that she was so weak it was advisable to call an ambulance instead; that she called the ambulance, and with the assistance of Miss Kennedy dressed the deceased and went with her, a little before twelve o'clock, noon, to St. John's Hospital; that deceased, when they were getting her ready to go to the hospital, was very weak and could dress only with difficulty and assistance; that on the way to the hospital, while in the ambulance, she had choking spells and it seemed as if her breath would leave her, and she would start coughing and spitting blood; that after the pneumonia sickness she had been troubled with smothering spells and

shortness of breath, especially when she went up or downstairs or had exercised; that she seemed to improve until about a week before her death, when, apparently, according to the testimony of this witness, she began to grow worse in that regard.

Charles McCabe, an undertaker's assistant, who went with the ambulance, testified that the colored domestic stated when he came there that Ida Murray had been sick; that she got up and tried to walk and fell down. Mattie Thomas denied that she made this statement to McCabe.

Plaintiff in error testified in his own behalf substantially in accord with what was testified to by the other witnesses as to the events that took place prior to the time he went up-stairs, shortly after eight o'clock on the morning of June 30. He testified further that when he went up-stairs he found deceased in the kitchen drinking beer, and that she reproached him for his attentions to some other woman while at the club house the preceding night. It may be said in this connection that Miss Kennedy testified that before he went to the club house on the night before he requested his wife to go with him, and that she refused because she thought it was damp and she might catch cold. Plaintiff in error further testified that shortly after he went up-stairs deceased threw a beer bottle at him, which struck the kitchen window and broke it; that he then caught her by the arm and she broke away and ran and in so doing stubbed her toe and fell; that he went to help her, apparently at her call for help, and she said, "Don't! I can't get my breath!" that then the occurrence as to her going to the hall door to get breath took place as testified to by Miss Kennedy; that thereafter they both went to bed for a time and then got up and went to the kitchen, where she sat on his lap, and afterwards both of them went to bed again; that he exercised no physical violence towards her in any way, except that he took her by the arm to prevent her throwing the beer bottle at him.

Ida Murray died at the hospital about three o'clock on the afternoon of the day she was taken there. After her death Josephine Kennedy with some difficulty woke the plaintiff in error, who had apparently been asleep since about eleven o'clock and was still sleeping heavily, and told him that Ida Murray was dead. He looked over towards her bed and asked where she was and then asked what caused her death, and was told by Miss Kennedy that she did not know.

An autopsy was held shortly after Ida Murray's death, apparently at the hospital, by Dr. Compton, with the assistance of two other physicians. The report of this autopsy was filed with the coroner and was introduced in evidence, and shows that the deceased had one bruise on the scalp, a black eye, some scratches on the face, whole right lung congested and filled with blood, and stated: "Died of this lung condition, possibly induced by this exhaustion or excitement, received during these minor injuries." Dr. Compton testified that the autopsy was held by him without any suggestions from anyone else, and stated on the trial that Ida Murray had a consolidated right lung,—one that had been inflamed at a previous time and had not become normal again,—a condition which generally follows pneumonia; that she had a black eye, scratches upon the right cheek, an effusion of blood under the scalp at one place, and left arm discolored black and blue from the shoulder to the elbow. This witness testified in response to various questions on direct and cross-examination, that the cause of her death was due to violence, in the condition she was in, the evidence of violence being the discolorations about her body, face and head; that she would not have died from the lung condition alone or from the violence alone unless they were brought together, but from her condition he believed that she had died from violence; that it was not the injuries themselves, contributing to the lung condition, that caused her death, but some excitement or ex-

haustion consequent upon those injuries; that it was not the injuries that caused the death nor the excitement, but the exhaustion caused by increased work on the heart; that exhaustion produced by other means than these injuries might possibly have been just as effective to cause death as the exhaustion produced by the injuries,—that is, that exhaustion caused by excitement, argument with someone or the excessive use of intoxicating liquors might have caused it. Dr. Smith, another one of the physicians who took part in the autopsy, testified that the statement in the certificate of said examination contained his views of the cause of the death; that both the physical effect of the injuries and the consequent exhaustion or excitement, contributing to the lung condition, caused the death, but that he did not believe that mere conversation or argument would be sufficient to produce the exhaustion. Dr. Aschauer, the third physician who assisted in the autopsy and signed the certificate of the post-mortem examination, testified that in his opinion the condition of the lung, with the combined exertion and violence and the high tension or excess tension on the vessels, caused exhaustion and death; that the connection between the injuries themselves and the death was entirely from the fact that the injuries might have created some agitation or exhaustion; that any other excitement or exhaustion, if extensive enough, would have been as efficient to co-operate with the lung condition to produce death, but that he did not think the excitement from great agitation in argument, or the excessive use of intoxicating liquors, or both of those together, would have produced a condition to cause death.

Counsel for plaintiff in error argue that the testimony of the doctors who conducted the autopsy should be discredited because they performed this autopsy without any authority of law. It appears that Dr. Compton was one of the attending physicians at St. John's Hospital and that the deceased was sent there by his advice, and he testified

that he made the autopsy of his own motion. Counsel for the State insist that Dr. Compton had full right to make the autopsy and should be commended for so doing. Right of possession of a dead body in the absence of any testamentary disposition belongs usually to the husband or wife or next of kin. (*Larson* v. *Chase,* 14 L. R. A. 85, and note; 47 Minn. 307.) A physician who performs an autopsy upon a dead body under legal sanction, with ordinary care and skill, is not liable in an action to the family of the deceased for the mutilation of the body without their consent. (*Cook* v. *Walley,* 1 Colo. 163; *Young* v. *College of Physicians,* 81 Md. 358; see, also, 13 Cyc. 280, and cases cited; 8 R. C. L. 695; *Palenzke* v. *Bruning,* 98 Ill. App. 644.) So far as we are advised, under the law of this State an autopsy should only be held in proper cases under the direction of the coroner or at the request of the relatives. In the view that we take of this case, however, we do not deem it necessary to consider or discuss at length the weight that should be given to the testimony of the physicians who held the autopsy.

Counsel for plaintiff in error argue that the court erred in giving the eighth instruction for the People, which reads:

"The court instructs the jury, as a matter of law, that if one who is in an enfeebled physical condition is unlawfully assaulted and an injury is inflicted upon her which is mortal to her in her enfeebled physical condition, then, even though such injury would not have been mortal to a woman in good health, still the assailant is deemed in law to be guilty of murder or manslaughter, as the case may be."

It is argued that this states a mere abstract principle of law not specifically applied to the facts in this case; that it invades the province of the jury because it assumes controverted facts: First, an assault; second, that the injury was inflicted thereby; and third, that the injury was mortal. Beyond question the instruction is faulty in assuming these controverted facts. This is practically conceded by

counsel for the State, but they insist that even though this
instruction, standing alone, would have been objectionable,
nevertheless, when read in connection with the ninth in-
struction, which stated these facts hypothetically, under the
reasoning of this court in *Duncan* v. *People,* 134 Ill. 110,
and *Keating* v. *People,* 160 id. 480, the giving of this in-
struction was not reversible error. We cannot so hold. The
crucial question in this case, as presented on this record,
was whether injuries found upon the body of the deceased
were the cause of her death, and this instruction assumed
that they were. This court has repeatedly held that where
the facts are controverted and the evidence is conflicting
it is error to assume such controverted facts to be true.
(*People* v. *Novick,* 265 Ill. 436, and cases there cited.)
Where one instruction states a correct principle of law and
another one states that principle incorrectly, and the evi-
dence is conflicting, it is impossible to say which instruction
the jury followed,—whether the one that stated the correct
principle or the erroneous one. *Enright* v. *People,* 155 Ill.
32; *People* v. *Lee,* 248 id. 64; *People* v. *Novick, supra;*
see, also, *People* v. *Schallman,* 273 Ill. 564.

Counsel for plaintiff in error also argue that the court
erred in giving the twelfth, thirteenth and fourteenth in-
structions for the People. The twelfth instruction reads
as follows:

"The court instructs the jury that while it is true that
under the laws of this State defendants in criminal cases
are competent witnesses in their own cases, yet you are in-
structed that their credibility is left by statute to the con-
sideration of the jury, and in considering the amount of
credit or value you will give to the testimony of the de-
fendant in this case you may take into consideration his
interest in the result of the case and his desire to avoid
punishment for the crime with which he is charged."

The thirteenth instruction contained the following lan-
guage, which, it is argued, misled the jury: "And in de-

termining the weight and credit to be given his testimony you have a right to consider not only the fact that he is the defendant on trial and his interest in the result of the suit, but also his demeanor on the witness stand," etc.

Counsel for plaintiff in error argue that the twelfth instruction and the portion quoted from the thirteenth instruction are wrong under the rulings of this court in *People* v. *Munday*, 280 Ill. 32, and *Hellyer* v. *People*, 186 id. 550, while counsel for the State argue that under the reasoning of this court as to alleged similar instructions in *Siebert* v. *People*, 143 Ill. 571, *Doyle* v. *People*, 147 id. 394, and *Aldrich* v. *People*, 224 id. 622, these instructions were correct. None of the instructions in any of the cases above referred to by either counsel are worded exactly like the twelfth instruction given for the People in this case. In our judgment the instructions given in *People* v. *Munday, supra*, and *People* v. *Arnold*, 248 Ill. 169, in the principles involved are more nearly like this one than the instructions given in the cases cited by counsel for the State. This instruction, as well as the words quoted from instruction 13, would tend to discredit the testimony of plaintiff in error and put him in an inferior class from the other witnesses testifying in the case, and would tend to lead the jury to believe that they were not bound to treat his testimony as the testimony of the other witnesses. This is contrary to the reasoning of this court in *People* v. *Munday, supra, People* v. *Arnold, supra, Hellyer* v. *People, supra,* and *Sullivan* v. *People*, 114 Ill. 24. In *People* v. *Harrison*, 261 Ill. 517, the court held that an instruction calling attention to the defendant's testimony should not be given without telling the jury that the same tests apply thereto as to the testimony of all other witnesses. There was nothing in the twelfth or thirteenth instruction which would lead the jury to understand that they were to apply the same tests to the testimony of the defendant as to other witnesses. In this case it was of great importance that the jury should

be correctly instructed as to the weight to be given to the testimony of plaintiff in error, as it was the only evidence offered on his behalf.

Counsel for plaintiff in error also argue at length and with great earnestness that the court erred in refusing two instructions asked by them as to the weight that should be given by the jury to the expert testimony. The first of these instructions reads as follows:

"The court has allowed in this case the introduction of expert testimony as to the cause of the death of Ida Murray. The court instructs you that the opinions expressed by such witnesses are not binding or conclusive upon you. It is for you to determine from all the facts and circumstances in the case what, in fact, was the cause of the death of Ida Murray, and you are not to act upon expert opinions to the entire exclusion of other testimony."

The other instruction stated substantially the same doctrine a little more at length.

There can be no question that the weight to be given the testimony of experts is to be determined by the jury. "There is no rule of law which requires them to surrender their judgment or to give a controlling influence to the opinions of scientific witnesses." (*The Conqueror,* 166 U. S. 110; see to the same effect, 5 Ency. of Evidence, sec. 637, and cases there cited.) "Even if several competent experts concur in their opinion and no opposing expert evidence is offered, the jury are still bound to decide the issue upon their own fair judgment assisted by the statements of the experts. * * * Nevertheless, the testimony of an expert may not be arbitrarily rejected, but, like the evidence of every other witness, it is to be considered by the jurors, who are to accord to it influence, much or little, according as it appeals to their intelligent and impartial minds in view of all the facts and circumstances developed upon the trial and the common knowledge and experience of mankind, and, when such common knowledge

utterly fails, the expert opinion may, of necessity, become controlling. * * * Of course, these declarations are affected greatly by the nature of the particular case under discussion, since expert evidence is far more clearly essential and trustworthy on some topics than on others, in which it may yet be held admissible, and also by the merits of the evidence in the particular case." (11 R. C. L. 586.) Instructions that the opinions of experts were to be considered in connection with and not to the exclusion of other testimony, and that the jury were to determine the issue for themselves from the whole evidence, were held proper in *Epps* v. *State,* 102 Ind. 539, and *Wagner* v. *State,* 116 id. 181. It was also held proper to instruct the jury as to the weight and effect of opinion evidence in *State* v. *Wertz,* 191 Mo. 569. (See, also, *State* v. *Hockett,* 70 Iowa, 442; *Wilcox* v. *State,* 94 Tenn. 106; *People* v. *Perriman,* 72 Mich. 184.) It has also been held by this court that the relative weight to be given to the opinions of medical and non-medical experts cannot be determined by any rule of law, although the strong presumption would be that where both classes of experts are given the same opportunities for observation, the opinions of medical experts would be entitled to the greater weight. But the weight to be given to the opinions of witnesses testifying as experts is always a matter to be determined by the jury from all the circumstances appearing in evidence, and it would be error for the court to instruct, as a matter of law, that the testimony of one class is entitled to greater weight than that of the other. (*Taylor* v. *Cox,* 153 Ill. 220; see, also, *Scott* v. *People,* 141 Ill. 195.) These instructions as worded were properly refused because they tended to cast discredit upon expert testimony.

It is argued with great earnestness by counsel for plaintiff in error that the evidence does not justify the verdict in this case, while it is argued just as earnestly by counsel for the State that the evidence overwhelmingly estab-

lishes the guilt of the plaintiff in error beyond all reasonable doubt; that the testimony of the plaintiff in error as to how the injuries were inflicted is so unreasonable as to be entirely unworthy of belief, and that, even though some technical errors may have been committed in the trial of the case, under the reasoning of this court in many cases such technical errors would not justify this court in reversing when the evidence of the guilt of plaintiff in error is so clear as it is here. (*People* v. *Conners,* 246 Ill. 9; *People* v. *Deluce,* 237 id. 541; *People* v. *Lutzow,* 240 id. 612.) We do not wish to express any opinion as to the evidence, except to say that in our judgment it is of such a character that the instructions and rulings on legal questions involved on the trial should have been accurate, and that in view of the erroneous rulings on instructions already considered the judgment of the trial court must be reversed and the cause remanded for further proceedings in harmony with the views herein expressed.

*Reversed and remanded.*

(No. 11956.—Reversed and remanded.)
C. B. GONES, Appellant, *vs.* J. G. FISHER, Appellee.

*Opinion filed February 20, 1919.*