(No. 13993.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES E. SAWHILL, Plaintiff in Error.

*Opinion filed October 22, 1921.*

1. CRIMINAL LAW—*indictment for confidence game may charge obtaining of credit.* An indictment charging the confidence game need not describe the property obtained but it is sufficient to charge that the defendant obtained money, property or credit.

2. SAME—*when president of corporation may be guilty of confidence game.* In a prosecution for the confidence game, the fact that the transaction was in the form of a legitimate contract is no defense, if, in fact, it was a swindling operation; nor is it a defense that the accused in such swindling operation used the confidence reposed in him to obtain money and credit for a corporation of which he was president.

3. SAME—*best evidence should be produced, if possible.* Ordinarily, where the contents of papers, written or printed, or of account books, are desired, the papers or the books themselves should be received as primary evidence to prove such contents, as such documents are the best evidence of what may be shown therein.

4. SAME—*party may testify after examination of books which cannot conveniently be examined in court.* Where the original evidence in a transaction consists of numerous documents, books, papers or records which cannot conveniently be examined in court and the fact to be proved is the general result of an examination of the whole collection, evidence may be given as to such result by any competent person who has examined the documents, provided the result is capable of being ascertained by calculation.

5. SAME—*when an adverse party may refer to books of account in cross-examining a witness.* Where a witness testifies as to the result of his examination of books of account which cannot be conveniently examined in court, the adverse party is entitled to cross-examine the witness to a reasonable extent by referring to the original books, where such books are accessible.

6. SAME—*cross-examination of expert by referring to books of account must be reasonable.* On cross-examining an expert witness who has testified as to the result of his examination of books of account, counsel should not be allowed to go into all the details of the accounts as shown on various pages of the books, but sufficient cross-examination should be permitted to show whether or not the witness has accurately and properly ascertained his results from the books.

7. SAME—*when counsel should be permitted to examine expert, witness as to his qualification.* Where a witness for the People in a confidence game prosecution testifies as to the result of his examination of books of account which cannot be conveniently examined in court and in his examination. in chief discloses that his knowledge of book-keeping has come to him from his experience as a lawyer, counsel for the defendant should be permitted to examine the witness as to his qualification to testify as an expert.

8. SAME—*expert should base his conclusions on matters found in the books examined.* An expert who is called to draw deductions from books of account should examine all of the books in which all the accounts are kept, whatever their nature, and his conclusions should be based only on the matters found in the books and not on oral statements of people who have been connected with the business or on other hearsay statements.

9. SAME—*when giving of numerous instructions defining reasonable doubt is error.* The giving of numerous instructions on the question of reasonable doubt is not to be commended, and the giving of seven such instructions, two of which are duplicates, is error.

10. SAME—*when instruction as to reasonable doubt is erroneous.* An instruction attempting to define reasonable doubt is erroneous which states that there must be more than a probability of the defendant's innocence before the jury can acquit him.

11. SAME—*what will sustain a charge of obtaining credit.* A charge of obtaining credit by means of the confidence game is sustained by proof that the defendant, by abuse of the confidence reposed in him, swindled his victim by obtaining his indorsement on certain notes of a corporation of which the defendant was president, on which notes he obtained money for the use of the corporation.

12. SAME—*instruction should not refer to duties of reviewing court.* An instruction in a criminal case should not be given which informs the jury that in discharging their functions they should not allow themselves to be influenced by any consideration of the duties which may, after the finding of their verdict, devolve upon a reviewing court.

13. SAME—*what remarks of State's attorney may be prejudicial though stricken out.* Remarks by the State's attorney in his argument in a confidence game prosecution referring to lawless outbreaks of inhabitants who have destroyed public buildings in other communities following a failure to convict persons charged with atrocious crimes are not justified and may be prejudicial even though promptly stricken by the court.

14. BRIEFS—*briefs should contain a concise statement of case.* A properly prepared brief should contain a clear and concise statement of the facts in the case without mingling therewith the argument or discussion of the legal questions involved.

WRIT OF ERROR to the Circuit Court of Woodford county; the Hon. GEORGE W. PATTON, Judge, presiding.

FRANK J. QUINN, and CLARENCE W. HEYL, (CHARLES V. O'HERN, and HARRY C. HEYL, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ERNEST J. HENDERSON, State's Attorney, and ALBERT D. RODENBERG, (THOMAS KENNEDY, and BARNES, MAGOON & BLACK, of counsel,) for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

Plaintiff in error, James E. Sawhill, was indicted in the· circuit court of Woodford county at the September term, 1920, certain counts of the indictment charging him with the confidence game and others with false pretenses. On the trial of the case he was found guilty under two counts charging him with the confidence game and he was sentenced to the penitentiary. This writ of error was sued out to review the proceedings.

The indictment contained eight counts. The first, third and fourth were quashed by the trial court. Not long after the evidence for the People had been introduced, mainly in support of the second count of the indictment, charging false pretenses, and the sixth and eighth, charging the confidence game, on order of court counsel for the State were required to elect as to what counts they would proceed under, and they elected to proceed under the sixth and eighth counts, charging the confidence game.

James E. Sawhill, the plaintiff in error, had been engaged for years as a bond salesman and broker in Chicago and other places. He came to Peoria, Illinois, it seems, in the spring of 1917 and worked for a company which had opened a brokerage office there under the name of Hen-

derson & Co. This company apparently had but small success, and shortly after plaintiff in error entered its employment Henderson & Co. went out of business and the enterprise was taken over by plaintiff in error and conducted by him under the name of Corn Belt Investment Company, the company not being incorporated. Plaintiff in error was the sole owner. In the beginning he had little or no capital. He secured the furniture and fixtures of the Henderson & Co. concern, but there was no definite proof in the record as to what this furniture was worth. It was, as we understand the record, all or partially covered at that time by a chattel mortgage given to the landlord to secure the rent. The evidence tends to show that plaintiff in error paid for this furniture and equipment and also that he built up a fairly successful brokerage business in the sale of stocks and bonds. He had his office well equipped with employees and furniture for that business, buying and selling high-class securities and dealing with good banks and other reliable financial concerns. In November, 1918, he organized a Delaware corporation under the name of "The Corn Be't Investment Company," which was also licensed to do business in Illinois. Its capital stock was divided into $50,000 preferred stock and $100,000 common stock. In organizing this new company plaintiff in error took to himself the common stock of $100,000 for his interest, "good will" and "going value" in the business theretofore conducted by him. Before September 1, 1919, the capital stock was increased from $150,000 to $300,000, all of the increase being preferred stock, and plaintiff in error was chosen president and manager of this new corporation. About that time he became acquainted with John A. Harper, who was assistant cashier in a bank at Eureka, Woodford county, Illinois. He interested Harper in helping to sell the stock of the new Corn Belt Investment Company and securities and in raising money among his neighbors in Eureka and the farmers in that vicinity. Plaintiff in error and Harper together in-

terested Frank O. Jury, who was a farmer in that vicinity, Pierce A. Felter, a retired farmer who had formerly been county treasurer of Woodford county, and George M. Hallam, a farmer and manager of a grain elevator, in the business of the Corn Belt Investment Company. Plaintiff in error and Harper first talked with Hallam about buying oil stock, and arrangements were made by the former to meet Hallam at a hotel in Chicago and go with him to investigate as to buying oil stock. In accordance with this agreement plaintiff in error met Hallam and went with him to the business offices of Babcock-Ruston & Co., where they met president Barnes of that company, who was also president of the Globe Oil Company. Hallam, at plaintiff in error's suggestion, went to visit the oil properties in Oklahoma and plaintiff in error paid the expenses, apparently through the Corn Belt Investment Company. On his return Hallam bought 1500 shares of oil stock through plaintiff in error for $1875. Harper knew of this trip and of the investment. Jury became a stockholder in the Corn Belt Investment Company early in 1919. He and Hallam and Felter were elected directors of that company on August 25, 1919. Jury appears to have been present at this meeting and to have taken part in the proceedings. Felter and Hallam were not present at the meeting but were shortly thereafter personally notified by Harper of their election, and Harper gave Felter $2500 worth of the common stock of the Corn Belt Investment Company, Felter testifying that Harper told him it was necessary to own stock in order to be a director. At this stockholders' meeting on August 25 a resolution was passed that the corporation should issue its notes up to $50,000 and discount them in order to obtain ready cash for use in the business. The notes were not dated but were then and there prepared for the signatures and for the endorsements of the directors. Plaintiff in error and Jury endorsed all of them at this meeting. About August 15, 1919, Hallam had been induced by the persua-

sions of Harper and plaintiff in error to sign a bond to the Central National Bank of Peoria, with plaintiff in error and Jury, to secure a credit of $25,000 for the corporation. After the meeting of August 25 Felter was informed by Harper of the resolution to borrow $50,000 on the corporation's notes, to be endorsed by all the directors, and Harper also explained to Felter that they needed his signature on the bond for $25,000, heretofore referred to, and got from Felter a statement of his financial condition. Felter signed the notes for the aggregate of $50,000 on August 25, or a day or two later, and also signed the bond for $25,000. Shortly thereafter he became dissatisfied with the arrangements that had been made and insisted on not continuing as a guarantor of the Corn Belt Investment Company's credit. The record tends to show that four of the notes which made up the $50,000 had been discounted by the Corn Belt Investment Company, the company receiving therefor about $15,000. At Felter's insistence the balance of the $50,000 in notes, amounting to $35,000, was surrendered to him and the notes were torn but not entirely destroyed. They were introduced in evidence in a mutilated condition on the trial of plaintiff in error. About the same time that these notes were destroyed Felter went to the Central National Bank of Peoria, to which the security bond of $25,000 had been given, and insisted that no further credit should be given to the Corn Belt Investment Company by said bank because of his signature on the bond. At that time it would appear from the record that $11,000 security had been granted by said bank to the company based on the bond.

Hallam testified that some time before he signed the $50,000 in notes and the bond for $25,000 he had been shown a financial statement of the Corn Belt Investment Company by Harper. There is a sharp dispute in the briefs, and the evidence in the record is not clear and definite, as to the statement that was shown to Hallam. There can be no question that prior to August 26, 1919, there was a fin-

ancial statement of·the company in existence. Such a state-
ment, the evidence tends to show, was based largely on the
monthly trial balances of the company, which were pre-
pared at the end of each month. Hallam claimed that about
August 26, 1919, and not later, a financial statement was
submitted to him as to said company which showed a sur-
plus of over $82,000. There was shown to. Hallam when
on the witness stand on this trial a financial statement of
the Corn Belt Investment Company which is called in the
record "People's Exhibit 7," which purported to give the
company's surplus as $82,966.86. This statement under
the heading had the words, "Balance sheet as of September
1, 1919." Hallam testified that he thought Exhibit 7 was
the financial statement that was shown him on or before
August 26, 1919, before he signed the bond and the $50,000
in notes. The trial court at first refused to admit this fin-
ancial statement, apparently on the ground that it was not
prepared previous to August 26, 1919, but afterward it was
concluded by the court, from Hallam's testimony, that it
was the same statement that was shown Hallam before
August 26, and the court admitted it. The evidence tends
quite strongly to show that this statement, setting forth
that it was a balance sheet of September 1, 1919, was not
prepared until the first of September, 1919, and probably
two or three days later. If these are the facts shown on
the record it should not have been admitted on the trial.
Counsel for the State apparently concede this, but they say
that even if this identical statement was prepared after
September 1, 1919, its admission should not justify a re-
versal of this case, because the evidence tends to show that
financial statements previously prepared showed substan-
tially the same surplus of the Corn Belt Investment Com-
pany as did Exhibit 7. This last contention of counsel for
the State is strongly contested by counsel for plaintiff in
error, and in view of the conclusions that we have reached
on other branches of the case it is unnecessary to definitely

decide that question. Of course, if Exhibit 7 was not prepared until after September 1, 1919, it should not have been admitted in evidence as the statement shown Hallam on or before August 26. Whether or not plaintiff in error was guilty, under the indictment, of the confidence game would depend upon whether or not the representations made to Hallam were made on or before August 26, 1919, and not thereafter.

It is argued by counsel for plaintiff in error that the indictment was insufficient in not charging the crime for which plaintiff in error was convicted with sufficient certainty and clearness. The case finally went to the jury on the sixth and eighth counts of the indictment, the sixth count charging the defendant with having obtained the "property" of George M. Hallam by means of the confidence game, the eighth count charging him with having obtained the "credit of George M. Hallam." The proof showed that the Corn Belt Investment Company received the proceeds of the four notes that were signed by Hallam and other directors, the notes being discounted at various banks. Section 98 of the Criminal Code provides: "Every person who shall obtain or attempt to obtain from any other person or persons any money, property or credit by means or by use of * * * instrument or device commonly called the confidence game." (Hurd's Stat. 1917, p. 972.) In construing this section and the other provisions of the statute referring to what it is necessary to state in an indictment to make it come under the statute, this court has held that such an indictment need not describe the property obtained; that it is sufficient to simply charge that the defendant obtained the money or property. (*People* v. *Brady,* 272 Ill. 401.) This decision is published in Ann. Cas. 1918C, on page 540, with a lengthy note citing many authorities in other jurisdictions which apparently hold as does this court with reference to similar statutes. (See, also, the ruling of this court on the same subject in *People*

v. *Miller,* 278 Ill. 490.)    By similar reasoning an indictment under the present statute charging the obtaining of credit must be held to be a valid indictment.

It would seem, also, that under the reasoning of this court in *People* v. *DePew,* 237 Ill. 574, the argument of counsel for plaintiff in error that the indictment is faulty because the money obtained on these notes went to the company and not to plaintiff in error cannot be sustained, as that decision held that the confidence game is defined as any swindling operation in which advantage is taken of the confidence reposed by the victim in the swindler.    The fact that the transaction was made to assume the form of a legitimate contract is not material, if, in fact, it was a swindling operation.

In our judgment the indictment was good and both the sixth and eighth counts were sufficient to sustain a conviction under the confidence game statute.    While the decisions in other jurisdictions in construing somewhat similar statutes are not conclusive, they tend to uphold this conclusion. See *People* v. *Genung,* 11 Wend. 18; *State* v. *Newell,* 1 Mo. 146; *Hubbert* v. *State,* 66 Texas Cr. 370; *Clawson* v. *State,* 129 Wis. 650; *State* v. *Patty,* 97 Iowa, 373.

Counsel for plaintiff in error further insist that a new trial should be granted in this case because the *corpus delicti* of the crime was only proven by the admissions or confessions of plaintiff in error.    The *corpus delicti* of the offense charged in the indictment was the procuring of Hallam's endorsement of the promissory notes in question, and we think the procuring of the endorsement, and the method by which it was obtained, were proven independently of any admissions or confessions of plaintiff in error, and therefore there was no error in the proof as to his admissions or confessions, so far as the *corpus delicti* was concerned.

One of the principal questions argued in the briefs in this cause is whether the trial court erred in its rulings as

299—26

to the admission of expert testimony with reference to the books of the Corn Belt Investment Company. The record shows that the company had kept books from the time it was incorporated, and that certain witnesses had examined these books and prepared written statements as to what they showed with reference to the condition of the business at the time Hallam signed said $50,000 in notes and the bond to the Peoria bank. Orman Ridgely, a practicing lawyer in Eureka, who was employed by Hallam in this matter, was one of the witnesses who testified to an examination of the books and who had prepared such a statement. Ridgely was offered as a witness by the State and testified as to his examination of the books and the statement so prepared. Such examination and the statement were introduced in evidence over the objection of counsel for plaintiff in error. When his counsel on cross-examination endeavored to ascertain from Ridgely certain facts shown by the books of account themselves the trial court refused to permit counsel to thus cross-examine Ridgely, holding that none of the account books were in evidence and that counsel were not permitted to use any of such books for cross-examination except one ledger. Later, Ridgely was put on the witness stand as a witness for plaintiff in error, and similar questions were raised as to examining him with reference to the accounts as shown in the books of the Corn Belt Investment Company. Perry W. Fitzhugh, who had been book-keeper for the company for some time before Hallam and Felter had been induced to sign the notes under consideration, was put on the witness stand by plaintiff in error and examined with reference to certain facts shown by the books of the company, and here, again, the trial court ruled that the books themselves could not be inquired into at any length by counsel nor examined by the witness while he was on the stand as to what certain marks on the books showed, in connection with the results of his

examination. The account books themselves were not permitted to be introduced in evidence.

It has long been the settled rule of the courts in this country that the best obtainable evidence should be adduced to prove every disputed fact. Where the contents of papers, written or printed, or of account books, are desired to be ascertained, the usual rule is that primary evidence must be received to prove such contents,—that is, the papers or the books themselves; that the original documents are considered primary evidence and the best evidence of what may be shown therein. This general rule, however, has been relaxed in certain ways in order to permit of reaching practical results in a convenient way, when shown to be necessary. Thus, where the originals consist of numerous documents, books, papers or records which cannot conveniently be examined in court and the fact to be proved is the general result of an examination of the whole collection, evidence may be given as to such result by any competent person who has examined the documents, provided the result is capable of being ascertained by calculation. It would be impossible for the jury to carry the numerous figures in their minds if merely read off to them by the witness, and it would be impracticable for the jurors to transcribe them for the purpose of adding them up themselves during the trial. It has therefore been held that it is in the discretion of the court to admit such statements or schedules of figures or the results of the examination of numerous documents or account books to be introduced in evidence, such statements, schedules or results to be verified by the testimony of the witness by whom they were prepared, allowing the adverse party an opportunity to examine them before they are admitted in evidence and to cross-examine the witness from the original books, where such books are accessible. *(People* v. *Gerold,* 265 Ill. 448; *Lynn* v. *Cumberland,* 77 Md. 449; 22 Corpus Juris, 1017, and cases there cited; Jones on Evidence,—2d ed.—sec. 206; 1 Greenleaf

on Evidence,—16th ed.—sec. 563*h;* 2 Wigmore on Evidence, sec. 1230; 2 Ency. of Evidence, 690; 3 Chamberlayne on Modern Law of Evidence, sec. 1841, and cases cited; *Burton* v. *Driggs,* 87 U. S. 125; *Elmira Roofing Co.* v. *Gould,* 71 Conn. 629.) Many of these authorities state directly that the books of account must ordinarily be introduced for inspection or for the purpose of cross-examination if requested by the opposite party, and none of them intimate that if the books are accessible and can be brought into court, opposing counsel shall not have every reasonable opportunity of examining them and cross-examining the expert who has prepared the schedules or statements therefrom in order to ascertain the correctness of his conclusions. Indeed, the weight of authority appears to be that the books themselves may properly be introduced in evidence, and that the only purpose of the expert witness in testifying to the schedule or a synopsis of their contents is to make such contents readily intelligible to the jury, and that the statements made by the expert witness as to the synopsis or the conclusions reached by them are not necessarily binding on the jury; that the jury may make their own calculations from the books and papers in evidence, regardless of the statements of the expert witness. (22 Corpus Juris, 1017.) This was the holding of this court in *Welsh* v. *Shumway,* 232 Ill. 54.

The circuit court's ruling that the account books could not be used by counsel for plaintiff in error in examining the expert witness who had testified as to the contents of such books was clearly wrong. It was apparently based on the theory that the account books themselves, where there are many, cannot be introduced on the trial of the case, the trial judge's idea apparently being that it is necessary, in order to ascertain the contents of the books, to require an expert accountant to go over them and prepare statements or schedules as to his conclusions as to what is shown by the books and then introduce these statements or schedules in

evidence, and that the expert cannot be examined, either on direct or cross-examination, at length with reference to the contents of the books; that if counsel desired to show the incorrectness of the conclusions or schedules of the expert witness it could not be done by cross-examination for the purpose of ascertaining those facts, but must be done by another expert going over the books and preparing schedules, synopses or conclusions as to what the books showed and thus contradict the other expert regarding his conclusions; that neither of the parties was entitled to show any of the details shown by the books of account but was only entitled to the expert's general conclusions, the court saying at one time in the examination: "I am not going to let all that pile of books in for you gentlemen on cross-examination. The rule adopted here is in accordance with the law, that an expert may go through the books to save the court and the jury the time of going through a large number of books. That is the ground. * * * I am not going to have them carry in all the books and then cross-examine as to any of them. * * * I am only giving you notice to save time. I am treating you fairly. * * * You don't have to carry all the books in here." Thereafter, on counsel for plaintiff in error suggesting that he would like to see the ledger to which the witness referred, the court said: "That is the only book I will allow to be carried in. Those are the rights of the court, and I will exercise them." The trial judge, as shown by this last statement and by other statements of similar character, apparently was of the opinion that the rule heretofore referred to, of allowing experts to examine numerous documents or account books and give a synopsis of the conclusions arrived at, was solely for the purpose of expediting the business and saving the court's time, and not primarily for the purpose of ascertaining the correct facts with reference to what the numerous documents or books showed. Such reasoning as to why the expert witness was permitted to examine the books of ac-

count and to give his conclusions or a synopsis of their showing was erroneous. Of course, this rule was adopted partly for the purpose of expediting business, but it is not intended to be so enforced that the truth of the conclusions of the expert cannot be thoroughly tested by cross-examination, on an examination of the books. The rule should be reasonably enforced by not permitting counsel, on cross-examination, to examine as to all the details of the accounts as shown on various pages of the books, but sufficient cross-examination should be permitted as to those details to show whether or not the expert witness had accurately and properly ascertained his results from the books. The rule enforced by the trial judge in this cause would result in a contest as to the experience and skill of the expert and not as to the truth of the books themselves.

We shall not attempt here to discuss the many rulings of the court in regard to the examination of accounts and point out in detail wherein the trial court was wrong in its rulings as to these various points. We deem it sufficient to say that many of the court's rulings in that regard were incorrect and so involved the merits of the trial as to the truth of the charges that plaintiff in error was guilty of the confidence game as charged in the indictment that the case must be heard again and an opportunity afforded of presenting fully before another jury the facts bearing on this question as shown by the account books of plaintiff in error, if such opportunity is desired by him. What we have said as to the general rules governing the examination of account books and showing the results therefrom by expert witnesses, and as to cross-examination with reference to the correctness of their conclusions, we think will be a sufficient guide on the next trial of this case on these questions. It appears from the briefs and record that the books of account were at the time of the circuit court's trial of this case in the possession of the referee in bankruptcy, but they seem to have been accessible for the purpose of examination

and to have been held by the referee in a room adjoining
the court room in the court house. While they may not have
been so accessible, under the circumstances of this case, as
to permit them to be introduced in evidence, there can be no
question that the attorneys in the case could have had full
access to them for the purpose of examining and cross-ex-
amining any of the expert witnesses with reference to the
accounts contained therein.

In this connection it will be well to discuss another ques-
tion raised in connection with the admission of the testi-
mony of the witness Ridgely. It is argued here, as it was
upon the trial, that Ridgely's testimony was improperly
admitted as that of an expert on the subject of book-keep-
ing or keeping accounts; that he was a lawyer by profes-
sion, and that his knowledge of the subject of expert book-
keeping had come to him from his experience in his profes-
sion, especially in the trial of cases. He testified that he
was familiar with double entry book-keeping in a general
way; that he had given more than a day's examination to
the books in making up his statement and drawing con-
clusions from what he found therein. After giving most of
his testimony in chief for the State as to the conclusions
he had reached from his study of the books, counsel for
plaintiff in error objected to certain questions that were
asked Ridgely on the ground that no sufficient basis had
been laid for introducing his testimony as to the books, ap-
parently, as we understand the objection from the record,
because he did not give to the books a study extensive
enough to enable him to give competent testimony thereon.
The further objection was made that he was not competent
to testify because he had not had sufficient experience in
matters of the kind to which he was testifying. Counsel
for plaintiff in error requested permission to examine him
as to whether he was competent, from experience and train-
ing, to testify. The court overruled this objection on the
ground that it had been waived and had not been made

early enough. The general rule as to the time to object to the competency of a witness seems to be that such objection should be made, if the grounds for such incompetency are known, as soon as the witness is sworn and before he is permitted to testify at all, but if the grounds of incompetency are not known at that time the objection should be made as soon as the incompetency is discovered, and then the testimony already given should be stricken out; that where the witness' incapacity is only partial, the objection need not be made until he is asked to testify to those matters as to which he is incapacitated; that no objection to the competency of the witness should be made after he has been cross-examined with knowledge of his incompetency or after the objecting party has himself taken the witness' testimony on the matters as to which he is alleged to be incompetent. (3 Ency. of Evidence, 174, 176, inclusive, and cases there cited; Rogers on Expert Testimony, 41, 58.) Nothing is shown in the record to indicate that the objection as to the incompetency of Ridgely was not taken as soon as counsel for plaintiff in error understood from the testimony that he was incompetent for the reason urged. We think it may be fairly said that his incompetency was unknown until counsel for plaintiff in error raised the question at the time they made a request to the court to examine him, particularly to ascertain whether he was competent to testify as an expert. Without doubt the general rule is that the qualification of experts rests largely in the discretion of the trial court and can only be reviewed when there is a clear abuse of such discretion by that court. *(People v. Spencer,* 264 Ill. 124, and cases there cited.) We cannot assert with absolute confidence, from the record before us, whether the witness was or was not qualified to testify on all the matters about which he did testify, and we think it is evident from the record, under the rules laid down by the authorities cited, that counsel for plaintiff in error should have been permitted, at the time they made the re-

quest, to examine the witness as to whether or not he was competent to testify on the matters about which he had been questioned.

There is one other question raised as to Ridgely's testimony. As has been said, he made a written statement as to the conclusions he drew from the books of account he had examined of the Corn Belt Investment Company. It is insisted on the one hand by counsel for plaintiff in error that his testimony shows that some of these conclusions were drawn from other sources than the books of account; that he had obtained the information from persons to whom he talked about the business of the Corn Belt Investment Company rather than from the books themselves; while counsel for the State insist just as strongly that the record shows he made the typewritten statement as to what the books of account showed, only from those books. There can be no question that the conclusions of experts should be gathered from the books themselves. Some of Ridgely's testimony tends to show that he obtained part of his information from persons who claimed to know about the company's affairs rather than from the books of account which he had examined. Counsel for the State insist that such part of his testimony was obtained from other books of the company that were not the general account books but had to do with the business affairs of the corporation. Beyond question, an expert who is called upon to draw deductions from the books of account of any firm or corporation should examine all the books in which all the accounts are kept, whatever their nature, but the expert's conclusions should be based only on the statements found in the books of the company, and not from oral statements of people who have been directly or indirectly connected with its business or from other hearsay statements.

Numerous objections are urged as to the giving and refusing instructions by the court. On that point it is first strongly urged that the court erred in giving seven sepa-

rate instructions for the People defining reasonable doubt. This court has frequently held that the giving of numerous instructions on the question of reasonable doubt is not to be commended. *(People* v. *Harrison,* 261 Ill. 517; *People* v. *Wallace,* 279 id. 139; *People* v. *Miller,* 292 id. 318; *People* v. *Jordan,* 292 id. 514.) Two of these instructions on reasonable doubt, No. 11 and No. 20, are exact duplicates one of the other. There does not seem to be even a variance in the punctuation. No. 10 and No. 21 also seem to be exact duplicates. There can be no question that the repeating of these instructions would tend to unduly impress the jury on the question of reasonable doubt, perhaps to the exclusion of other questions equally important, and this court has held in *People* v. *Harrison, supra,* that the duplication of instructions on the same question is erroneous. The giving of seven instructions on reasonable doubt and the repetition of instructions on this question in identical language was erroneous.

We are also of the opinion that People's instruction 15 on reasonable doubt should not have been given. It was not limited to the insufficiency of evidence offered by the People to prove guilt and practically permitted the jury to go outside of the evidence to search or hunt up doubts, which was held to be objectionable in *People* v. *Andrae,* 295 Ill. 445. This instruction was also erroneous because in effect it told the jury that the doubt upon which they could acquit must be one of probability, or, in other words, mere probability of innocence. This wording was subject to the criticism of this court as laid down in *People* v. *Fox,* 269 Ill. 300, where it was held that "no court of last resort has approved an instruction which informed the jury that a doubt upon which the jury could acquit must not be one of probability."

Instruction 4 given on behalf of the People is criticised because it is said it singled out the plaintiff in error and directed particular attention to his testimony different from

the testimony of any other witness in the case. People's instruction 18 is also subject to the same criticism. These instructions are somewhat loosely worded, and while the case ought not to be reversed for that error alone, they should not have been given under the reasoning of this court in *Chambers* v. *People,* 105 Ill. 409, *Hellyer* v. *People,* 186 id. 550, *Schultz* v. *People,* 210 id. 196, *People* v. *Gerold, supra,* and *People* v. *Harvey,* 286 Ill. 593.

It is also urged that there was error in giving People's instruction 12, wherein the court referred to "the prisoner at the bar," it being argued by counsel for plaintiff in error that he was not held in custody and was out on bail during the trial and therefore not a prisoner; and it is also argued as objectionable because it instructed the jury, among other things, that in discharging their functions "you should not allow yourselves to be influenced in your deliberations by any consideration of the duties which may, after the finding of your verdict, devolve upon this or a higher reviewing court." This quoted part of the instruction was in effect held erroneous by this court in the opinion in *Falk* v. *People,* 42 Ill. 331, where it was stated that the jury should have been "left to their own responsibility, alone, to decide on the guilt or innocence of the prisoner, giving to him the benefit of all reasonable doubts, without any reference to the possible future action of the court." This instruction should not have been given.

Objection is also made to the giving and refusing of numerous other instructions to which we do not find it necessary to refer in detail, but we have examined them and do not think any reversible error was committed in any of the rulings with reference thereto.

It is also objected that reversible error was committed in the trial of the case by the remarks of the prosecutor in his closing argument, when commenting on the actions of plaintiff in error and what he had done in reference to the offenses charged in the indictment. He said: "If this kind

of thing is to be taken by this jury as honest and the door is to be open to everybody else to go and do likewise,—if Woodford county has thrown down the bars and wants to be picked,—why, then, gentlemen, I don't know what the criminal laws of the State of Illinois are to come to. I do know, gentlemen, that there comes a time when the public becomes so aroused and so disgusted with the failure to enforce criminal laws that most awful things have happened in this country of ours. I do know, gentlemen of the jury, that only a few years ago, because of failure of justice, that the court house in Cincinnati was wrecked by an outraged public. I do know that when the streets of the city of Omaha became unsafe for white women to walk on at night that a million dollar building was practically torn down and a nigger hung to a lamp-post." Objection was made to the reference to the Cincinnati and Omaha court houses, and the court held that such remarks were improper and the jury should disregard them. While these remarks were promptly stricken by the court on the trial as soon as objection was made, we do not think the attorney for the State was in any way justified in making them. These references to the riotous proceedings in Omaha and Cincinnati had no bearing on the character of the crime that was here under consideration. What was said by this court in *Fox* v. *People,* 95 Ill. 71, *McDonald* v. *People,* 126 id. 150, *Bishop* v. *Chicago Junction Railway Co.* 289 id. 63, *People* v. *King,* 276 id. 138, and *People* v. *Chrfrikas,* 295 id. 222, plainly indicates the court's position on remarks of this nature by attorneys in the trial of a case. We cannot say that these remarks did not improperly influence the jury in this case even though promptly stricken by the court.

It is also earnestly insisted that prejudicial error was committed in the remarks made by the trial judge during the trial of the case, and much space is taken up by counsel on this question in the briefs and too much feeling is shown

by counsel for both parties in discussing these various questions. Without doubt some of the remarks should not have been made, but we do not think the judgment should be reversed because of the special remarks of the court, outside of any erroneous rulings on the law heretofore referred to. What has been said by this court in discussing the part the trial court should take in the trial of a case is fully covered by opinions of this court in cases already cited, (see *O'Shea* v. *People,* 218 Ill. 352, *People* v. *Bernstein,* 250 id. 63, and *People* v. *Lurie,* 276 id. 630, and authorities there cited,) and we do not find it necessary to lay down any further rules on this subject. Instead of spending quite so much time on the briefs in discussing matters of this kind, we think counsel would have given greater assistance to this court in the investigation of the record had the briefs been prepared with greater care and the rules of this court as to the preparation of briefs more carefully followed. Rule 15 of the printed rules of this court states that the briefs "shall contain a short and clear statement of the case, including, first, the form of the action; second, the nature of the pleadings sufficiently to show what the issues were, and to present any question subject to review arising on such pleadings; third, in cases depending upon the evidence the leading facts which such evidence proved or tended to prove, without discussion or argument and without detail." The statement of the case in behalf of plaintiff in error occupies 77 printed pages, and it is not simply a statement of facts without discussion or argument, but it intermingles quotations from the evidence with repeated arguments as to error in the court's rulings concerning the admission and exclusion of evidence. Such arguments as to the rulings of the court would be of much greater assistance to the court if found in the argument part of the brief and not in the statement of the case. While the brief of counsel for the State criticises the brief of counsel for the plaintiff in error in this regard it makes no real attempt to

remedy the defects of plaintiff in error's brief by giving a short and concise statement of the case, as required by the rules of this court. It cannot be too often called to the attention of counsel that a very important part of the briefs in assisting a court of review in reaching the right result as to the issues involved in the case is a properly prepared statement of the case, without argument or discussion of the legal questions involved. Nothing is of greater assistance to a court of review in disposing of a case than to have the statement in the briefs made in a clear and logical manner, setting out the story of the case and the issues involved, without any attempt in that portion of the briefs to argue as to the writer's views on the various points. The most helpful statement is one that gives a clear story of the case, letting the actual facts speak for themselves.

It is argued that the evidence in the record does not justify the verdict. In view of the fact that the judgment must be reversed and further proceedings had on other points, we do not think it advisable to discuss in this opinion the weight of the evidence.

Numerous other questions have been raised in the briefs, but we think no reversible error was committed in regard to any of them and many of the questions will not come up on a new trial of the case, therefore we will not further extend this opinion by commenting on them. What we have said in the opinion we think so fully covers the material points in the case as to serve as a fair guide in the further hearing of this case.

Because of the errors committed on the trial the judgment will be reversed and the cause remanded to the circuit court for further proceedings in harmony with the views herein expressed.

*Reversed and remanded.*