## STATE v. OLSON.

No. 4902. Decided April 24, 1930. (287 P. 181.)

*George P. Parker,* Attorney General, and *L. A. Miner,* Assistant Attorney General, for the State.

*F. W. James* and *J. Louis Brown,* both of Salt Lake City, for appellant.

EPHRAIM HANSON, J.

Defendant was convicted of embezzlement. The information charged that he was the agent and employee of the

Midvale State Bank and as such fraudulently appropriated to his own use the sum of $1,000 on January 2, 1926, which came into his possession and under his control by virtue of his employment. From the conviction and the judgment imposed upon him, he has appealed to this court.

A brief statement of the facts will aid in understanding the questions presented by the assignment of errors.

The accused was cashier of the bank. He had held such position from the organization of the bank, approximately eighteen years. A. L. Anderson was assistant cashier, and had been such for a great many years. The record does not disclose what other, if any, employees were regularly engaged in the bank. The defendant as cashier, had complete charge of the bank and its funds. The other employees were under his direction and supervision. There was an auditing committee, consisting of three of the directors, and this committee examined the books once each three months. On March 25, 1928, while this committee was in course of making one of its regular examinations of the books, the defendant told E. L. Burgon, a member of the committee, that, when the committee came to the checking accounts, it would find a $25,000 shortage. This was the first knowledge or initmation Mr. Burgon had of a shortage in the bank, although he had been a director for eighteen years and a member of the auditing committee for more than five years. It seems clear that it was the first knowledge that had come to any of the directors of the bank that there was any shortage. This examination was made Sunday, March 25, 1928. The examination made at this time did not disclose any material shortage in the savings accounts, but, owing to the disclosure of the shortage in the checking accounts made by the defendant and as verified by the examination of the auditing committee, a special meeting was held Monday morning at the bank at which W. S. Chipman, president of the bank, John A. Aylett and Joseph M. Holt, two of the directors, Walter H. Hadlock and Herbert Taylor, two bank examiners from the

office of the state bank examiner, and defendant were present. Before the others had arrived at the bank, Mr. Holt asked defendant what the meeting was for. Defendant replied that there was "something wrong" in the bank. For a statement of what occurred, and as to what was said at the time and place, we here quote from the testimony of W. S. Chipman given at the trial and as preserved in the bill of exceptions:

"I asked Mr. Olson what was wrong, and he told me that they had a shortage of $25,000.00 in their individual accounts; and I asked him how long it had been going on and he said upward of ten years. * * * I asked him how he had been able to get by the bank examiners all this while and he told me it was through the manipulation of loose leaves; that when the bank examiners would come he would remove enough sheets to aggregate the $25,000.00. * * * I asked him who assisted him in working these books and covering up the shortage. He told me he was alone, he had no assistants, he had done it himself. * * * I asked Mr. Olson how the savings accounts were and he told me they were all right, and I called in the assistant, Mr. Anderson. * * * I called Mr. Anderson in and asked him if he did not assist Mr. Olson in the manipulation of these accounts to deceive the bank examiners and he said he did. I asked him if there was any other shortage in the bank and he said that there was a shortage in the savings accounts, more than there was in the individual accounts, and he estimated the shortage to be upwards of $40,000.00 * * * I asked Mr. Anderson how they manipulated these accounts and he told me these individual accounts, they removed the leaves when there was an examination. * * * Mr. Olson stated that he did not think the shortage should be over $33,000.00. Mr. Anderson put it a great deal higher than that all the time."

On cross-examination, Mr. Chipman said that he thought Mr. Anderson stated to him that the shortage started when the bank made a "poor loan" to the Childers Leasing Company.

An examination of the books and records was then made by the bank examiners, Hadlock and Taylor, in which all present, including the defendant, assisted. With reference to the savings accounts, they took each individual account

as shown in the ledger of those accounts and made a list on an adding machine and checked it against the amounts apportioned to the savings account by the general ledger or control account. The same method was followed with reference to the checking accounts and also the notes. It was thus found that the savings account as shown by the individual ledger were $29,964.01 in excess of the control account; that the total of the checking accounts exceeded the amounts apportioned to such accounts by the control account by over $25,000; that in the notes there were $8,242.50 less than was shown by the loans and discount account. With these figures before them, Mr. Taylor asked the defendant "if there was any further shortage in any way." The defendant then stated that "an examination of some of the pass books would reveal a further difference of upwards of $10,000 additional shortage," and made special reference to Mrs. D. A. Drown's account. Mr. Burgon, who had not been present during the morning, came to the bank shortly after the noon hour and had a conference with the defendant and Mr. Anderson. Mr. Burgon asked defendant why he had not told him about the shortage in the savings accounts on Sunday, and either defendant or Anderson (witness did not remember which, but said one or the other) answered and said, "We didn't want to break the news all at one time; we wanted the officials of the bank to get a part of the information," and "thought it would be easier that way."

Defendant was removed from duty at the bank, and on the second day following, namely, March 28th, Mr. Hadlock and Mr. Taylor closed the bank for business. The record does not disclose how long the bank was closed, but Mr. Taylor was in control for two months and until the directors and stockholders had paid dollar for dollar of all accounts. The state bank commissioner employed an auditing company to make an audit of the books and records of the bank. The actual work of the audit, was done by Mr. Guiver. Mr. Guiver testified that he spent forty-five days

in making the audit and preparing his report; that he made a complete audit of the bank's condition for 1928, and went back over the books for 1927 and on certain accounts he went back several years. He testified that he found a shortage of $88,652.45 as of Saturday March 24, 1928. Of this amount $54,694.45 was in the savings accounts, $25,305.50 was in the checking accounts, and $8,242.50 was in the notes. The witness also testified that he was able to trace certain credits, amounting to the sum of $1,330, as shown by the passbook of Mrs. Drown, should have been posted to her savings account, but which was deflected instead to the credit of the defendant's account. This consisted mainly of $35 monthly deposits made by Mrs. Drown beginning with October, 1924, and then continued to almost the end of the account.

On the state's offer, there were received in evidence the bank's ledger of the savings account of Mrs. Drown, consisting of ledger leaves marked as Exhibits A and B, also her passbook, marked as Exhibit C. On Exhibit B is shown a debit entry or charge of $1,000 as of January 2, 1926. It is to this transaction that the prosecution anchors its case.

It is admitted by counsel for defendant that Exhibit C is Mrs. Drown's passbook, and that the $1,000 was not drawn out of the bank by Mrs. Drown or at her instance and request. The amount of Mrs. Drown's account as of January 2, 1926, as shown by her passbook, was $8,960. The amount as shown by the bank's ledger of this account as of that date is $2,201.28, making a difference of $6,763.72 that her account was short. The shortage of this account as of March 24, 1928, was $9,580.04, and this amount was reflected in the general shortage of the bank. Mr. Taylor testified that this particular entry appeared to be in Mr. Anderson's handwriting. He also testified that a number of the entries appeared to be in defendant's handwriting.

It is shown that, in computing interest on a savings account, the practice followed by banks generally is to compute the interest on the amount shown by the bank ledger,

and that the figures representing the interest would be copied from the ledger to the depositor's passbook. In this case, for the purpose of the bank's record, the interest was computed according to the amount shown by the bank's ledger and for Mrs. Drown the interest was computed according to the amount shown by her passbook.

The first ground of complaint relates to the shortage and the manner in which the term was employed during the trial. The appellant complains because, in his opening statement, the district attorney told the jury the state would show that there was a shortage of $88,152.45 ■ of the funds of the bank on March 24, 1928, that the bank examiners and expert accountant were permitted to testify to such shortage, and that a number of witnesses were permitted to testify concerning statements and admissions made by the accused as to the existence of the shortage at the meeting held at the bank Monday March 26, 1928. The appellant gives as his reason for this contention that it was never "clearly shown that these shortages were caused by money" or other assets "leaving the bank" through appellant's fraudulent conduct "or simply by poor loans that were charged off." Appellant further asserts that "not one of the auditors wanted to testify as to just what was meant by shortage." This contention does not correctly reflect the record in that connection. As cashier of the bank, appellant was undoubtedly thoroughly familiar with any transaction where a bad loan had been accounted for as a shortage rather than, as is usual, to charge the same off as a loss. Yet in his brief he has directed our attention to but two instances where he claims that such was done. In the first instance he refers to the loan to Childers Leasing Company. There is not a word of evidence in the record as to what this transaction was or how it was disposed of except reference is made to it as a "poor loan" by counsel for appellant in his cross-examination of Mr. Chipman. Counsel asked, "They told you the shortage started when they made that poor loan?" The witness

answered, "I think that Mr. Anderson did." In this question and answer we have all that the record discloses concerning this transaction, yet much of appellant's briefs are devoted to it. Appellant never once asserted that the shortage he was talking about in his conversations with the board of directors of the bank and the bank examiners at the meeting March 24, 1928, was occasioned, wholly or in part by losses which were caused or sustained by "poor loans." He designated the situation as "something wrong" and something to be concealed from the bank examiners and directors. Even though we assume that defendant would be entitled to any exculpatory statements made by Anderson in connection with the admission or statement made by the latter in connection with his admission or statement that he had assisted the defendant to manipulate the books to prevent detection of their "wrongs," the statement made by Anderson does not justify the inference that the loan, if there were a loan, entered into or became a part of the shortage. It rather fixes the circumstance or transaction co-ordinate in point of time with the inception or beginning of the shortage. Were it a loan, even though a poor one, there would unmistakably be a corresponding asset in the form of a promissory note or other obligation to pay. At least such is what we have to assume in the absence of further information concerning the matter. It should be kept in mind that, whatever was the result of the alleged transaction, it was more than ten years before the audit was made by Mr. Guiver.

Our attention is also directed to what counsel for appellant has called the Steadman note for $3,000 face value, signed by Mr. Steadman and two of his sons. Mr. Guiver stated that when he made the audit all three signers were called in, and that they denied having signed the note, and said that their signatures thereto were forgeries. Upon the assumption that it was a forged instrument, the note was not treated by Guiver in his audit as an asset, as it would have been had the signatures been genuine. It is

obvious that in so treating the note the shortage was increased proportionately. There is no evidence in the record to show that the signatures to the note are genuine. Mr. Guiver, however, testified on cross-examination that he had heard since he made the audit that the signers of the note had acknowledged their signatures to the note as being genuine. In the event that the signatures are genuine, the only result would be that the shortage would be reduced in the amount of the note.

In reference to the statement of appellant that "no one of the auditors wanted to testify as to just what was meant by shortage," the answer of the witness to whom the direct question was put as to what they meant when they employed the term or used the words "shortage" in their testimony may be of material assistance in determining this phase of the question. Mr. Burgon, testifying of the shortage in the savings accounts as shown on Monday February 26, 1928, in answer to a direct question put to him by appellant's attorney, said: "The bank ledger showed more than the control account by $33,000.00. That is, the savings ledger showed that much more than the control ledger had apportioned to the savings account. * * * The control account had to be correct because that represented the amount of money that we had." Mr. Taylor, in stating what he meant by shortage, said: "I mean that either the assets as shown by the (bank) statement are not all accounted for or the liabilities are greater than the liabilities accounted for". "But," asked counsel for appellant, "that does not mean that any of the officials of the bank got the money?" To this the witness answered: "It means that somebody got it." Upon further cross-examination, the witness stated he did not know what made up the shortage, but he knew it was not poor loans, as they would not have been shown in that way. It could only mean that the proper credits were not shown or the proper assets were not accounted for. Mr. Hadlock, the state bank examiner, after testifying as to the respective amounts of the shortages in the

checking accounts, the savings accounts and the notes, and how himself and those he had helping him had arrived at these amounts, said that when he referred to such "shortages" he meant the difference between the liabilities as reflected in the individual checking accounts, individual savings accounts, and the assets as shown by the notes compared with the control total of the bank's statement in reference to those same accounts, and, when the liabilities as shown in the checking accounts and savings accounts exceeded the amount apportioned to those accounts in the control account and the assets represented by the notes were less than those represented in the control account, there was a diminution of the assets of the bank to the extent of the difference in those various accounts.

It is certain from the record before us that there was a very considerable shortage, competent and uncontradicted evidence showing the amount to be $88,152.15. It is equally certain from the record that the shortage was not made up, either in whole or in part, by losses due to poor loans, with the possible exception of what has been designated the Steadman note, which, as we have seen, was treated as a forged note. It may not improperly be here stated that the losses arising from poor loans should not, under any known system of bookkeeping, affect the amounts due the individual depositors so as to reflect a shortage in their individual accounts with the bank such as was done in Mrs. Drown's account. This could not arise except by the clearest and most open kind of pilfering by some one.

Evidence that reasonably tends to establish the facts sought to be proved is relevant and is admissible unless forbidden by some one of the exclusionary rules of evidence. Counsel for appellant have not called our attention to any rule or principle excluding the fact that there is such a shortage, and there is none which presents itself to our minds. The bank does not keep the money which it receives from its depositors in separate individual

funds corresponding with the depositors. It is all mingled together in one account. It is not necessary to allege or prove from whom the defendant, as the agent of the bank, received the money which is the subject of the embezzlement. It is sufficient to show that out of the gross sum of money received by him as such he has embezzled a portion. It would seem that there could be no doubt but that a general shortage or deficiency in the cash account of the bank would tend very materially to establish such a case. *State* v. *Meeker,* 72 N. J. Law, 210, 61 A. 381; *People* v. *Maljan,* 34 Cal. App. 384, 167 P. 547; *State* v. *Hasledahl,* 3 N. D. 36, 53 N. W. 430.

Appellant also complains of the remoteness of the shortage which was shown, and contends that "the fact of a general shortage two years and three months subsequent to the alleged embezzlement of $1,000.00 is no evidence at all of the commission of that crime and is highly prejudicial." There is no merit to appellant's contention in this regard. By his own admission the shortage began back ten years before, and approximately eight years before the offense charged in the information was committed. From the evidence in the case, it seems certain that the amount of the shortage grew constantly larger with each succeeding year. It is conclusively established that on January 2, 1926, Mrs. Drown's account, as we have already stated in this opinion, was short $6,763.72, and by March 24, 1928, the shortage in that account had increased to $9,589.04 and was reflected in the general shortage.

It is also urged that the trial court erred in admitting over objection evidence of the statements and admissions made by defendant concerning the shortage and the means resorted to by him to escape detection by the state bank examiner before the corpus delicti had been established. Ordinarily, when the state seeks to introduce evidence of extrajudicial statements or admissions of

the defendant connecting him with the commission of the crime charged, the corpus delicti should be first proved. But, inasmuch as the order of proof is largely within the discretion of the trial court, it is not error, in the absence of a showing that the defendant will be prejudiced thereby, to permit evidence of statements and admissions of the defendant implicating him with the crime charged before the existence of the corpus delicti is established, if, as was done in this case, the corpus delicti was subsequently proved. *People* v. *Barnnovich,* 16 Cal. App. 427, 117 P. 572; *People* v. *Swaile,* 12 Cal. App. 192, 107 P. 134; *People* v. *Wagner,* 29 Cal. App. 363, 155 P. 649; *State* v. *James,* 96 N. J. Law, 132, 114 A. 553, 16 A. L. R. 1141; *People* v. *Saunders,* 13 Cal. 743, 110 P. 825; 16 C. J. p. 865, § 2180; Id. p. 737, § 1514, subheading "Order of Proof." Certainly in the present case the corpus delicti was established beyond a reasonable doubt by evidence aside from and independent of the statements and admissions of the accused. The testimony of the bank examiners and the auditor showed the shortage existing in three different funds of the bank. Their testimony showed that credits which should have been posted to Mrs. Drowns ledger account were deflected to the defendant's individual account; that her ledger account had been falsified by unauthorized debit charges and by omitting to post credits therein which should have been posted. Daily reports were also falsified by making the loans and discounts show an excess over the actual amount of notes in the bank, and the individual checking and savings accounts shown by such statements were less by many thousands of dollars than the liabilities as actually reflected in the individual ledger accounts. In all of this there is not a single feature that can be accounted for on any reasonable hypothesis of innocence.

Over defendant's objection to the effect that the questions called for conclusions of the witnesses and that the books were the best evidence, the court permitted each of the bank

examiners. Mr. Taylor and Mr. Hadlock, and also Mr. Guiver, the accountant, to give the results of their examinations of the books and records of the Midvale State Bank bearing upon the shortages in various funds of the bank and also the shortage in the savings account of Mrs. Drown. These rulings are made the subject of a considerable number of assignments. We find no error in the court's rulings here complained of. The witnesses were all expert accountants, and employed their time exclusively in examining books and records of banks and other business institutions. Their conclusions were based entirely on the books and records of the bank as they had found them upon their examination of them. It is well settled that where the original evidence consists of books of account, records, and papers which might properly be used in evidence are numerous and voluminous and cannot be satisfactorily or conveniently examined in court, it is competent for any qualified person who has examined them to testify as to the result of such examination with regard to the subject under investigation. *Cleveland, C., C. & St. L. Ry Co.* v. *Woodbury Glass Co.* (Ind. App.) 120 N. E. 426, page 433; *People* v. *Moone,* 334 Ill. 590, 166 N. E. 481, page 487; 2 Wigmore, Ev., § 1230 (first and second edition) ; 16 C. J. p. 615, § 1211; 22 C. J. p. 1017, § 1303; *People* v. *Sawhill,* 299 Ill. 393, 132 N. E. 477.

Counsel for appellant further insist that there were no books of record in court and that appellant was entitled to have them there for the reason that there was no showing made that the books could not have been produced in court. The record shows that there were received in evidence the ledger account of Mrs. Drown's savings account, her passbook, the daily cash statement of the bank, eight reports or statements of the condition of the bank, several sheets of the daily blotter, and that at the conclusion of the direct examination of Mr. Hadlock, Mr. Moyle special counsel for the state said to counsel for defendant, "I will say we will produce any record counsel may desire," to

which there was no response of any kind. Subsequently, at the request of defendant's counsel, there were brought into court a large number of paid checks of Leon L. Olson, the defendant, and also paid checks of the Tenabo Mining Company and a teller's blotter for January 5, 1926. In answer to questions put to him by appellant's attorney, Mr. Guiver stated that he did not have all of the books in court that he had used in making the audit; that he did have, however, all those supporting his claim of shortage and all those which tended to show and by which he was enabled to allocate portions of the general shortage that reflected themselves in the checking account of Leon L. Olson and Olson Bros., Incorporated. Appellant does not complain because the books were not introduced in evidence, but only because they were not present in court; yet the only case referred to by him on the subject is *State* v. *Paulson,* 27 S. D. 24, 129 N. W. 558, where the statement is made that, "in cases wherein examination and compensation may be shown, the rules of evidence require the records themselves to be offered in connection therewith." On the question as to whether the original books and papers must be introduced in evidence in connection with the testimony of an expert accountant or other competent person in giving the result of his examination thereof, there seems to be some conflict of opinion among the authorities. Prof. Wigmore, in speaking on this question, says: "Most courts require, as a condition, that the mass thus summarily testified to shall, if the occasion seem to require it, be placed at hand in court, or at least be made accessible to the opposing party; in order that the correctness of the evidence may be tested by inspection if desired, or that the material for cross-examination may be available." 2 Wigmore, Ev. (2d Ed.) § 1230. See, also, 16 C. J. p. 617, § 1211. Sound reason dictates and the authorities hold that, if the books are accessible and can be brought into court, opposing counsel should have every reasonable opportunity to examine them and to use them on cross-examination so that he may ascer-

tain the correctness of the conclusion of the person, testifying as to the result of his examination of the originals. There is no reason why this may not be done if the books are present in court or are otherwise satisfactorily made available to opposing counsel without having them all introduced in evidence in the first instance. Furthermore, if all the books and records are not present in court, or are not satisfactorily made available to opposing counsel, they may be brought into court or be otherwise made available to opposing counsel by a proper application to the court for an order requiring that that be done. As we read the adjudicated cases, such seems to be the prevailing practice where all the records are not already before the court. *People* v. *Moone,* supra; *Inter-State Finance Corp.* v. *Commercial Jewelry Co.,* 280 Ill. 116, 117 N. E. 440; *Elmira Roofing Co.* v. *Gould,* 71 Conn. 629, 42 A. 1002.

As the situation is presented by the record in the present case, it appears that all of the books which were examined by Mr. Guiver, the auditor, were not present in the courtroom. As hereinbefore stated, in addition to the books, statements, and accounts received in evidence and Mr. Moyle's proffer to produce any record counsel might desire, there were present in court all the books and records necessary to show the shortage and also those from which the auditor said he was able to allocate portions of the shortage to certain individual accounts. In such a situation, if the appellant had desired any additional books and records, he should have applied to the court to require the state to produce them before he may be heard to complain that all the books actually examined by the auditor were not present in court. Instead of requesting the state's attorney for such additional books or accounts as appellant might have desired and in the event that such request was of no avail applying to the court for an order requiring the state's attorney to produce them, only this veiled request was made by appellant of the witness Guiver near the end of the

cross-examination of that witness, as appears in the record before us.

"Now, in the morning will you bring me all of the records you used in making a compilation of your audit? I want to cross-examine you on that. A. All of the records I used?

"Q. Yes. A. May I ask Mr. Moyle (special counsel for the state) a question?

"No, he has got nothing to do with my cross-examination, ask me? A. May I ask you how I can get some of the records from the Midvale State Bank?

"Q. If we could get them, we have no control over it. A. I don't know how I will get them."

Later, in reference to this same subject, the record shows that this colloquy was had:

"The Court: I understood from the line of questioning you were not expecting the witness to bring those books in.

"Mr. James (Counsel for defendant): I differ from the Court's ruling, if they are willing to stand on the way they present their case I am.

"The Court: The question of whether or not you want the books brought in—

"Mr. James: I will leave the burden to the state.

"The Court: You are not asking for them.

"Mr. James: I am making the suggestion that you get them."

In our opinion the foregoing was not sufficient request upon the state's attorney to have other books or records brought into court or otherwise made available to the defendant for this examination and use at the trial. Neither was it, in the event of a refusal or a failure on the part of the prosecution to produce them, a sufficient application to the court for an order requiring the books and records brought in. Therefore appellant may not at this time be heard to complain because other or additional books which he might have desired to use at the trial were not there. The court has ample power and authority to have required the prosecution to have the books that are accessible brought

into court for the use of the defendant and undoubtedly would have exercised its jurisdiction in this regard had it been properly invoked by appellant.

Appellant's next contention goes to the extent to which the experts were permitted to testify from their respective examinations. Stating the contention in the langauge of appellant's brief, it is this: The expert "was allowed to testify * * * as to the amount and falsity of entries and as to what he thought of them; the appellant claiming that an accountant cannot give his opinion as to what the entry was but only as to the entry and as to the result of his calculation." Under this general objection, fourteen of the fifty-two separtely stated assignments of error have been grouped. We have examined all of the assignments so grouped in the light of the foregoing criticism, and except for assignments numbered 26, 27, and 28, none of them is subject to such objection. By assignment No. 26 it is shown that Mr. Guiver was asked whether he was able to state if any of the general shortage reflects itself in the personal checking account of Leon L. Olson. The court overruling the objection that the question called for a conclusion of the witness and that the records speak for themselves, the witness answered, "Yes sir." Considered a preliminary question seeking the opinion of the witness as an expert accountant as to whether, according to the correct practice of accountancy, he was able to state from the examination of the books and accounts of the bank that he had made any portion of the shortage was reflected in the personal checking account of Mr. Olson, the question is not subject to appellant's objection. But counsel for the state is then expected to follow it up and develop with some particularity just how the witness was able to ascertain such fact from the books and records and accounts of the bank so that the trial judge may determine as a matter of law whether there was any competent probative value to the finding of the witness in such particular in order that he might know whether to submit it to or withhold it from

the jury. This was not done, and the answer stands in the record as a mere conclusion. It is then followed up with a question directing the witness to examine his report made to the state bank commissioner containing the result of the witness' audit of the bank books and records to refresh his memory and give the amount thus reflected. Over the objection that it was incompetent, irrelevant, and immaterial, the witness was permitted to answer "$6,379.00." That is the subject of the twenty-seventh assignment. As before stated, it is incompetent for the reason that as it stands it is but the conclusion of the witness. Accountants and other competent persons are permitted as a matter of convenience to state what the books contain or what they do not contain (*San Pedro L. Co.* v. *Reynolds,* 121 Cal. 74, 53 P. 410), if the negative is relevant, as it often is, and as it undoubtedly was in this particular instance. It may be true that an expert accountant, by an examination of Mr. Olson's checking account and all the credit slips with reference thereto, might find an insufficient number of credit slips to make up the total amount of credits which had actually been posted to the credit of this account. He might also find in his examination of the credit slips pertaining to other individual accounts that credits had not been posted to those accounts corresponding with the credit slips, but that corresponding amounts at about the same time had been posted as credits in Mr. Olson's account. This would all have cogent probative value, and most certainly should be permitted to go to the jury. To have made the state's question competent, the witness would have had to lay before the court and jury such facts which he found or failed to find in the books and which led him to the conclusion that $6,370 of the general shortage was traceable to the Olson account. Assignment No. 28 involves the same principle. Though we find there was error in this particular, we are unable to see how it could have been prejudicial, under the state of the record in this case. This information erroneously placed before the jury tended to connect the defen-

dant with the general shortage, and nothing else. His connection is, as we think, established, if not conclusively, at least beyond a reasonable doubt, by his own admissions upon three occasions, as is shown in the statement of the evidence. Such error, under the foregoing facts, was not prejudicial.

Further assignments of error are predicated on the court's refusal to give certain requested instructions to the jury. We have made a careful examination of each of the requests as well as the statements of counsel in connection therewith. We find each of the assignments to be without merit.

JUDGMENT AFFIRMED.

CHERRY, C. J., and STRAUP, ELIAS HANSEN, and FOLLAND, JJ., concur.